UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 CV 05575**

DANIEL ATKINS G. ATKINS
8-10 27th Ave _ #302
Astoria, NY 11102

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

Pitney Bowes Mgmt Services
250 W. 34B Street
New York, NY.

*(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the space
provided, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of names.
Typically, the company or organization named in your charge
to the Equal Employment Opportunity Commission should be
named as a defendant. Addresses should not be included here.)*

(see sheet
attached)

**COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION**

Jury Trial: ☑ Yes ☐ No
*(check one)*

RECEIVED
JUL 16 2012
PRO SE OFFICE

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

____ ✓    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
*NOTE: In order to bring suit in federal district court under Title VII, you must first obtain a
Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

____    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
*NOTE: In order to bring suit in federal district court under the Age Discrimination in
Employment Act, you must first file a charge with the Equal Employment Opportunity
Commission.*

____    Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
*NOTE: In order to bring suit in federal district court under the Americans with Disabilities Act,
you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
Commission.*

____    New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

____    New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).

Daniel G. Atkins
        Plaintiff,

Pitney Bowes Management Services (at White & Case LLP)
Luis Medina   (Manager)
Brian Covil   (Supervisor)
Fidel Razack (Supervisor)
Jerry Lester  (Supervisor)
(Located at White & Case LLP)
1155 Avenue of America. Lower Level
New York, NY. 10036

Pitney Bower Management Service.
Mr. Gerard Frassitu (Area Operations Mgr)
250 W. 34th St Street
NYC. NY. 10119

**I.     Parties in this complaint:**

A.     List your name, address and telephone number.  Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff     Name     DANIEL GRAHAM ATKINS

Street Address     8-10 27th Ave.   Apt. 302

County, City     ASTORIA, NY

State & Zip Code     NY     11102

Telephone Number     347-706-0408

B.     List all defendants' names and the address where each defendant may be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets of paper as necessary.

Mr. GERARD FRASSITA   C/o: Pitney Bowes Mgmt Svcs.

Defendant     Name     Pitney Bowes Mgmt Services

Luis Medina     Street Address     250 W. 34th Street   33 RD flr.

Bryan Cov/L     County, City     New York City

Fidel Rovzack     State & Zip Code     New York

JERRY Lester     Telephone Number

→ BRIEF COVER

(SEE SHEET ATTACHED + cover of Complaint)

C.     The address at which I sought employment or was employed by the defendant(s) is:

Employer     Pitney Bowes Management Services

Street Address     250 W. 33 RD St. 33 RD flr.

County, City     New York

State & Zip Code     New York     -1

Telephone Number

**II.     Statement of Claim:**

State as briefly as possible the <u>facts</u> of your case, including relevant dates and events.  Describe how you were discriminated against.  If you are pursuing claims under other federal or state statutes, you should include facts to support those claims.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.   Attach additional sheets of paper as necessary.

A.   The discriminatory conduct of which I complain in this action includes: (*check only those that apply*)

_____     Failure to hire me.

Yes     Termination of my employment.

Yes     Failure to promote me.

_____     Failure to accommodate my disability.

• YES     Unequal terms and conditions of my employment.

<u>Yes</u>      Retaliation.                                                   (Slander)

<u>Yes</u>      Other acts (specify): _Harrassment, whistle blower, falsification_ of Employ
                                                                              ment records

*Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity
        Commission can be considered by the federal district court under the federal employment
        discrimination statutes.*          several

B.   It is my best recollection that the alleged discriminatory acts occurred on: _____.
                                                                              Date(s)

C.   I believe that defendant(s) *(check one)*:

     ___✓___         is still committing these acts against me.

     _____         is not still committing these acts against me.

D.   Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

     ☑   race   _African American_          ☑   color   _Black_

     ☐   gender/sex   _____           ☑   religion _Christian (in practice)_
                                                         defending my faith
     ☐   national origin   _____

     ☐   age.   My date of birth is _____ *(Give your date of birth only
                *if you are asserting a claim of age discrimination.)*

     ☐   disability or perceived disability, _____ *(specify)*

E.   The facts of my case are as follow *(attach additional sheets as necessary)*:

     _Assaulted by supervisor._
     _Religious slur led to other actions by supervisor, And manager (such as remo_
     _-val_
     _Transferred to demoted position with continued to placed on promotion_
     _Be falsely accused of threatening manager_
     _Called a trouble maker. when I told manager about fire card cheating_
     _Terminated when inquired about "full scope" of training sessions and_
     _labelled on being "insubordinated". (And more) - see brief_

*Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of
        your charge filed with the Equal Employment Opportunity Commission, the New York State
        Division of Human Rights or the New York City Commission on Human Rights.*

## III.   Exhaustion of Federal Administrative Remedies:

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or
     my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct
     on: _Feb 07, 2012_____ *(Date)*.

B.    The Equal Employment Opportunity Commission *(check one)*:

_____    has not issued a Notice of Right to Sue letter.

*4/26/2012*    issued a Notice of Right to Sue letter, which I received on _____ (Date).   *APPROX. 05/01/2012*

> *Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C.    Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

_____    60 days or more have elapsed.

_____    less than 60 days have elapsed.

## IV.    Relief:

**WHEREFORE,** plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: House, Educational loans cost, lenox bill Hospital bill for eye injury cost, FBMS retireme immediatly $79000 annually for their fraudulent acts, 5.5 million toward charities, And 3.5 damage to me *(Describe relief sought, including amount of damages, if any, and the basis for such relief.)* (see sheet attached)

*See Sheets attached*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 16 day of July , 2012

Signature of Plaintiff     Daniel Atkins

Address     8-10-27th Ave. #302

Astoria NY 11102

Telephone Number     347-706-0408

Fax Number *(if you have one)*     none

## DAMAGES SOUGHT IN SUMMARY JUDGEMENT

1. As for my being the plaintiff, in this matter, I would appreciate to court granting me the total of the sum of $35,000,000.00 for all of my pain and suffering. My reputations (over the years) have been damage beyond the defendant's ability to repair it. Therefore, this is what I openly seek

2. But (Or), if the previous request is not favorably acceptable to the court as the first choice, I seek the following measures of relieve)

   - .Since, Pitney Bowes had (or persuaded) Mr. Atkins that his transfer would be a relief (and it wasn't), Mr. Atkins is asking the court to have Pitney Bowes give him a housing arrangement of his choosing (since he has been in a some-what homeless state since moving to New York) – plaintiff's homeless state was caused by false lure never amounted to much to facilitate and descent housing situation[1] where plaintiff could be comfortable in a reasonable housing situation

   - Pay for his education received since moving here (since previous cost[2] was affordable and out of pocket the defendant pay the current cost amounts in student loans) – Since training was proposed letter of invitation to training not being valid and plaintiff  (later) finding out that it was not available (as management offered) the cost of college was greater in New York then what plaintiff had been paying for in Washington DC (plus, PBMS education funds would them a exemption for educational training courses for  their employees with tax deductable credit)

   - Payment of medical bill[3], as it related to the eye injury received as a result of assault and battery by mailroom supervisor (Jerry Lester) – Injury related to assault and this is an penalty for the cause of assault and injury acquired in result of confrontation

---

[1] The listing will read – two-family / brick house in the South Jamaica area of Queens, and with no mortgage (in excellent condition from those own by Bank of /America – who owns thousands of 'foreclosed' homes that someone is 'still' occupying and they have already foreclosed on and has someone living there to help keep up the maintenance on. the property.

[2] During my school cost, in the Washington DC area, was at a level where plaintiff was paying out of pocket rates – compared to the current student loans which plaintiff will have problems paying for in the future

[3] Since, the inadvertent injury happened in lure of the (hidden) assault by mailroom supervisor the plaintiff is (rightfully0 looking for defendant to pay for. (Not withstanding, the future eye treatments needed going forward)

- Retirement[4], at the cost of $75,000.00 annually, (since they have erased him past history and altered it for someone to earn much less that what he might have been earning in the position of Customer Service Manager today at Pitney Bowes). Although, n most cases, a Customer Service Manager, of the same length of time since 1992 would have been making far more than $75,000.00 annually – Since PBMS lied about original position and plaintiff's employment history they should retire him immediately and pay him what he might have earned by now if he got position that he was qualified for/ Attached, is an article in response to this requested amount – which is the cost of living in New York City)

- The allotment of 8.5 million dollars (to go to selected charities[5] of Mr. Atkins' choosing) – Pitney Bowes donates to charities every year and this is a tax deduction so they can afford this request here

- In addition tot he above, I am asking for the allotment of 6.5 million dollars to Mr. Atkins ( for all of his pain, suffering, embarrassment, terror, trauma, the name-calling, the defamation of character, bad write-ups, and for all of the other acts against plaintiff character, health and reputation). For all of the pain

- In addition, the suffering received by plaintiff over the past e=ten years of his employment, as Pitney Bowes lied and cheated their way through the process to protect themselves from prosecution.

---

[4] Since, the plaintiff's employment is no longer wanted and he has serve Pitney Bowes well in the past (plus, the plaintiff nearing the years of retirement) he desires to retire in a comfortable manner, and with the acceptable cost of living for New Yorkers is at $75,000.00 annually. He would desire that the defend ant do so in order to make up for his being negated from the 'fair' practice of promotions and having his employment history erased for their profit.
[5] His is not a poor company, and their ability to fund charities would not be a case of hardship on this company. I think that two churches (that the plaintiff could recommend) would be ideal for the defendant to support in this fashion, and it would not be of any burden to defendant because they give out large funds to charities all of the time.

Special Note:

The court might think that plaintiff's request might seem a bit much, but they are not. Plaintiff realizes how many clients' names that the defendant put in jeopardy when they falsified the plaintiff's name during their acts of deceit. The defendant risked their clients' names, mentioned in this litigated matter, when they ignored the truth about plaintiff attempting to 'sabotage' project (which is clearly demonstrated with their manager's instructions[47] stating to delay any copy job labeled as ASAP_. They took that risk when they allowed lies against plaintiff to be written. They lied when they destroy pertinent evidence (such as clients' logs) to protect themselves form being proved wrong in two particular incidents. They transferred plaintiff to New York City without even thinking about whether they really had any good intentions to play fair with the plaintiff. intentions to extend an opportunities for the plaintiff to advance if he kept his nose clean. Again, they violated during their discourse  The defendant never sort to make out incident reports to protect their employee's health, but chose to disregard company policy to protect themselves from incidents against the plaintiff and violate their own rules. Again, at-will will protect the company against harm when they are legally sound judgment calls. But, at will does not protect that company from wrongdoings (and against criminal negligence.

Ignorance is not an excuse for recklessness. Their clients ought to know that the defendant are acting in an unfavorable manner while conducting business on their premises and could drag them into legal entanglements in the future. Therefore, the plaintiff feels that what he is asking for is sound and not a whole lot compared to what this case what be requiring with an accomplished attorney. In this plaintiff's case he had asked for $150,000,000. In the previous engagement, in Washington DC, plaintiff reencountered fraudulent activities involving Bank of America (and former attorny0 and the lost of $6,000.00. Plaintiff does not wish to include these facts I this litigated matter, but reserves the right to make notice of additional charges that would take this case into another direction, which might indicate more conspiracy matters from this defendants' clients.

---

[47] PB 01137 This document instructs 'all' copy operators, and leaders, to delay (or hold0 any copy job labeled ASAP. The defendant framed plaintiff and transferred him out of site.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622
General FAX (212) 336-3625

**BY US MAIL**

Mr. Daniel Atkins
P.O. Box 0582
New York, New York 10016

RE:                          Daniel Atkins v. Pitney Bowes Mgnt./White & Case, LLP
EEOC Charge No.:                     520- 2012-01211

Dear Mr. Atkins:

This office is in receipt of your request for a *Notice of Right to Sue* on the above-referenced charge.

Ordinarily, a charging party or his/her counsel is not entitled to receive a *Notice of Right to Sue* upon request until the charge has been pending with the EEOC for at least 180 days.  However, an early *Notice of Right to Sue* is authorized by 29 C.F.R. § 1601.28(a)(2) if the Director determines that the Commission will not be able to complete its administrative process within 180 days of the date the charge was filed.

We have reviewed all of the circumstances of this case and have determined that issuing you the requested *Notice of Right to Sue* is warranted at this time.  Specifically, given our office's current workload, we have concluded that the EEOC will be unable to complete the processing of this charge within 180 days of the date the charge was filed.

Enclosed is your *Notice of Right to Sue*.  If you have any questions, please contact Investigator Guest at (212) 336-3620.

On Behalf of the Commission:

*Kevin J. Berry* and for

Kevin J. Berry, *District Director*
*New York District Office*

APR 2 6 2012
_____
Date

Enclosure

EEOC Form 161-B (11/09)          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Daniel Atkins**<br>**P.O. Box 0582**<br>**New York, NY 10016** | From: | **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

| ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2012-01211** | **Arlean C. Nieto,**<br>**Supervisory Investigator** | **(212) 336-3676** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

| ☐ | More than 180 days have passed since the filing of this charge. |
| ☒ | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| ☒ | The EEOC is terminating its processing of this charge. |
| ☐ | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

| ☐ | The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost. |
| ☐ | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Kevin J. Berry aw*
*for*

**Kevin J. Berry,**
**District Director**

APR **2 6** 2012

*(Date Mailed)*

Enclosures(s)

cc:     **Attn**
        **Director of Human Resources**
        **PITNEY BOWES MANAGEMENT/WHITE & CASE LLP**
        **1 Penn Plaza**
        **New York, NY 10116**

Enclosure with EEOC

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed to you* (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

## FACTS ABOUT FILING
## AN EMPLOYMENT DISCRIMINATION SUIT
## IN FEDERAL COURT IN NEW YORK STATE

You have received a document which is the final determination or other final action of the Commission. This ends our handling of your charge. The Commission's action is effective upon receipt. Now, you must decide whether you want to file a private lawsuit in court. This fact sheet answers several commonly asked questions about filing a private lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit. You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge. The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred. However, you should contact the court directly if you have questions where to file your lawsuit. New York State has four federal districts:

- The United States District Court for the Southern District of New York is located at 500 Pearl Street in Manhattan. It covers the counties of Bronx, Dutchess, New York (Manhattan), Orange, Putnam, Rockland, Sullivan, and Westchester. (212) 805-0136 http://www.nysd.uscourts.gov

- The United States District Court for the Eastern District of New York is located at 225 Cadman Plaza in Brooklyn and covers the counties of Kings (Brooklyn), Nassau, Queens, Richmond (Staten Island), and Suffolk. (718) 613-2600 http://www.nyed.uscourts.gov

- The United States District Court for the Western District of New York is located at 68 Court Street in Buffalo. It covers the counties of Allegheny, Cattaraugus, Chautauqua, Chemung, Erie, Genesee, Livingston, Monroe, Niagara, Ontario, Orleans, Schuyler, Seneca, Steuben, Wayne, Wyoming, and Yates. (716) 551-4211 http://www.nywd.uscourts.gov

- The United States District Court for the Northern District of New York is located at 100 South Clinton Street in Syracuse and covers the counties of Albany, Broome, Cayuga, Chanango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Greene, Hamilton, Herkimer, Jefferson, Lewis, Madison, Montgomery, Oneida, Onandaga, Oswego, Otsego, Rensselaer, St. Lawrence, Saratoga, Schenectady, Schoharie, Tioga, Tompkins, Ulster, Warren, and Washington. This District Court's pro Se Attorney has offices at 10 Broad Street in Utica New York. (315) 234-8500 http://www.nynd.uscourts.gov

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit must be filed in U.S. District Court within 90 days of the date you receive the enclosed EEOC Notice of Right to Sue. Otherwise, you will have lost your right to sue.

(Over)

## DO I NEED A LAWYER?

No, you do not need a lawyer to file a private suit.  You may file a complaint in federal court without a lawyer which is called a pro se complaint.  Every district court has either a clerk or staff attorney who can assist you in filing pro se.  To find out how to file a pro se complaint, contact the clerk of the court having jurisdiction over your case who can advise you of the appropriate person to assist you and of the procedures to follow, which may vary from district to district.

You may, however, wish to retain a lawyer if you choose. Whether you retain a private attorney, or file pro se, you must file your suit in the appropriate court within 90 days of receiving this mailing.

## WHAT IF I WANT A LAWYER BUT I CAN'T AFFORD ONE?

If you can't afford a lawyer, the U.S. District Court which has jurisdiction may assist you in obtaining a lawyer.  You must file papers with the court requesting the appointment of counsel. You should consult with the office of the district court that assists pro se complainants for specific instructions on how to seek counsel.  The appointment of counsel in any pro se complaint is always at the discretion of the court.

Generally, the U.S. District Court charges a $350.00 filing fee to commence a lawsuit.  However, the court may waive the filing fee if you cannot afford to pay it.  You should ask the office of the District Court that assists pro se complainants for information concerning the necessary procedure to request that the filing fee be waived.

## HOW CAN I FIND A LAWYER?

These are several attorney referral services operated by bar or other attorney organizations which may assist you in finding a lawyer and ascertaining and asserting your legal rights:

American Bar Association
(800) 285-2221  www.abanet.org

New York State Bar Association
(800) 342-3661  www.nysba.org

New York City Bar Association
Legal Referral Service
(212) 626-7373

National Employment Lawyers Association
Referral Service  (212) 819-9450
http://www.nelany.com/EN

Other local Bar Associations in your area may also be of assistance.

## HOW LONG WILL THE EEOC RETAIN MY CASE FILE?

Generally, the Commission's rules call for your charge file to be destroyed  2 years from the date of a determination, but time frames may vary.  If you file suit and wish to request a copy of your investigative file, you or your attorney should make the request in writing as soon as possible. If you file suit, you or your attorney should also notify this office when the lawsuit is resolved.

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
New York District Office
33 Whitehall Street, 5th Fl
New York, N.Y. 10004

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

100163900

FIRST CLASS



02 1R
000200302 6          $ 00.46⁰
MAILED FROM ZIP CODE 10004
UNITED STATES POSTAGE
PITNEY BOWES
APR 26 2012

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **520-2012-01211** |

| **New York State Division Of Human Rights** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Mr. Daniel Atkins** | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **P.O. Box 0582,** | **New York, NY 10016** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **PITNEY BOWES MANAGEMENT/ White & Case, LLP** | **500 or More** | **(917) 351-2919** |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| **1 Penn Plaza,** | **New York, NY 10116** | |

RECEIVED
FEB 07 2012
EEOC-NYDO-CRTIU

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE ☐ COLOR ☐ SEX ☒ RELIGION ☐ NATIONAL ORIGIN<br>☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION<br>☐ OTHER *(Specify)* | Earliest **11/2010**    Latest **1/30/2012**<br><br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

I have worked for Pitney Bowes Management at White & Case, LLP since March 1990 as a Customer Associate.

After I objected to a negative religious comment made by a supervisor, I was permanently assigned to the mailroom and subject to harassment. I believe this transfer was an unfair assignment and I was subsequently terminated.

I believe I was subject to discrimination based on race and religion and retaliated against in violation of the Civil Rights Acts of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>*Daniel G. Atkin* |
| **Feb 07, 2012**    *Daniel G. Atkins*<br>Date      *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

DA0011

IN THE UNITED STATED DIXTRICT COURT FOR
THE SOURTHERN DISTRICT OF NEW YORK

Daniel Atkins
8-10 27th Avenue                                    Civil Action _____
Astoria, N.Y. 11102

   Plaintiff,

Pitney Bowes Management Services
[White & Case LLP]
Luis Medina (Copy Center Manager)
Brian Covil (Copy Center Supervisor)
Fidel Razack (Copy Center Supervisor)
(Lower Level)
1155 Avenue of America
New York City, NY 10036

   Defendants,

Pitney Bowes Management Services
White & Case LLP,
Jerry Lester (Mailroom Supervisor)
(Lower Level)
1155 Avenue of America
New York, NY 10036

Defendants

PITNEY BOWES MGNT SERVICES, INC.
Human Resources Manager (Gerard Frassita)
250 West 34th Street 33rd Floors
New York, New York 10119

Defendant,


## COMPLAINT

     I, Daniel Atkins, am the plaintiff in this case and I am a sixty three year old

African American male. I am filing  this suit against my former employer, of twenty two

years, and I allege as follow; Racial and Religious Discrimination, Wrongful

Termination, Retaliation in relations to his acts of Whistle Blowing, Hostile Workplace.

There have been many other harassing actions against the plaintiff that which were have covered-up by Pitney Bowes Management Series. They include not only counts of harassment, but  slander, assaults, being spat on by manager, deceitful exploitation of working assignments, deceitful misrepresentation of employment history[1]), and more. All of this has hurt the plaintiff ability to establish a livable livelihood and the defendant has viciously denied ever knowing that about any harmful efforts against him have been employed to cover up any infractions against him that may have been their fault.

The plaintiff continued to suffer from the humiliations by his termination, by the defendant, because he wanted to get an in-depth explanation on how these training sessions' by effect his future (and their use against any information concerning his past bad treatment). The plaintiff asked to have an explanation of the full scope of these sessions for his own protection and he wanted to know whether the use these training sessions might violate his civil rights in the future. Pitney Bowes refused to answer his questions and they decided to terminate him. Pitney Bowes hiding his past records (which includes his leadership qualification and honorable mentioning are examples of what plaintiff feared that these documents would allow Pitney Bowes to cover up with his signature permission). He never refused to take these sessions, but only asked for a full explanation as to how these would affect him in the future).

Plaintiff asked both copy center manager (Luis Medina) and Human Resources generalist (Montey Lopez) to explain he depth of these sessions at this time. But, the plaintiff feels that the defendant's reason did not stop there but it also included the cover-up o f time card (theft). And in addition to the already mentioned reasons, the defendant has used every other intimidating scheme to force plaintiff to quit (one, being his transfer to the mailroom on supervisor's request). And, after they were not successful in doing so the defendant finally used the 'false clause of in-sub ordinance' to unjustly terminate the plaintiff (especially when his threat to exposed the many illegal acts of theft by manager and supervisors) linking to their acts of embezzlement of funds through overcharging Pitney Bowes (and client White & Case LLP) through excessive weekly overtime (and reporting tie).

---

[1] These falsehood widely used to demote and keep plaintiff in lower level assignments, while limiting him to entry level positions in future employment.

By cheating on their time reporting they stole money regularly and the plaintiff irritated the manager when he reported that the supervisor (Fidel Razack) was controlling this process. Moreover, after the plaintiff complained to the manager about the theft, and the existing hostile climate at work (in the copy center) he was eventually was released from his duties there and placed in the mailroom as a retaliatory action. The defendant conspired against the plaintiff, and they constructed a plot to destroy his employment career by making up false reports against him and later, by using the training sessions to terminate plaintiff for good. These acts of retaliation hurt the plaintiff and has destroyed his career with Pitney Bowes (where he has had years of faithful service prior to the last ten years of his employ). Plaintiff informed manager about payroll infringements, but he ignored that warning and it seemed that he (too) was violating standard of corporate because he did not work full (five day) work week and had supervisors cover for his absences.

The defendant's past performance proves to set an example of the plaintiff's fears as to what they have done to him in the past by using the clause "privilege information'. This, as the plaintiff feared possible termination after he provided the defendant with request on training sessions and that sessions would serve as placing a cap on his freedom to complain about his abuses. The defendant never assured him otherwise when he requested them to do so. The plaintiff believes that the defendant would do the same as they have done (to him) in the past (which include terminating him and hiding pertinent records that might show favorable to the plaintiff's in his defense against existence of more fraudulent acts against him) by Pitney Bowes Management Services.

I am asking the court to consider that the evidence presented from the past as pertinent material for review and discovery by using the process of 'judicial notice'. I am asking the court to consider the process of 'judicial notice' as they examine pertinent reasons to bring this case forward as a jury trial case where the court can use its ability to judge based on the additional evidence that is linked to the current predicament that we engaged in today's situation. The plaintiff is also asking that the use of a jury help grant this case due justice for the purpose in allowing the plaintiff to have his name cleared and make the defendant pay for their treachery against him.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this civil action with respect to federal counts of discrimination, harassment, physical assaults, and retaliation pursuant with respect to Title VII, 42 U.S.C 2000e, disparate treatment pursuant to 42 U.S.C 1981, constructive termination and or transfer, and failure to renew contract. All this resulting to 42 U.S.C.A 1983 several modes of false acts lodged against him in the workplace before terminating his services, with the additional charges of wrongful and constructive discharge (and the deprivation of employee's rights).

## VENUE

2. Venue is the Southern District of New York is appropriate as most of complaints of the past six years occurred within the boundaries of the Southern District of New York State.

## PARTIES

3. Plaintiff, Daniel Atkins, is an African American male, of the age of sixty-three years of age and he had been employee for nearly twenty-two years for the defendant.

4. Pitney Bowes is a corporation, licensed to do business in New York and has over 15 employees.

5. Defendants Luis Medina, agent and employees of Pitney Bowes and occupies the position of Customer Service Manager in the copy center (at the contracted site of White & Case LLP, located at 1155 Avenue of the America in New York City). His actions are one of the reasons Pitney Bowes Management Services is being sued in his positions as an agent in his official capacity.

6. Defendants Brian Covil, Fidel Razack, and Jerry Lester[2] all occupy the position as supervisors (Team Leads) in the copy center and mailroom at the Pitney Bowes

---

[2] Mr. Lester, physically, assaulted me. From that encounter, I received an injury to the eye a few days later from the stress that was building up in me (inadvertent effect) N.D.N.Y. 1998 Hansel v. Sheridan 991 F.Supp 69 Under New York law, once intentional offensive contact has been established, actor is liable for assault and not negligence, even when physical injuries nay have been inflicted ;inadvertently'

(contracted services in the company of White & Case LLP, located at 1155 Avenue of the America, in New York City). Their actions are one of the reasons Pitney Bowes is being sued on their positions as agents in this capacity.

7. Defendant Mr. Gerard Frassita, agent and employee of Pitney Management Services' Bowes (who occupies the position as New York City Area Operational Manager and Human Resources Director (in the New York City office), is being sued for assisting in withholding employee's official records and failure to reveal information to legality of training sessions and making sure that plaintiff knew what was required of him before allowing termination of plaintiff through illegal measures performed by Managers and supervisors at White & Case LLP

8. Defendant, Mr. Frassita is responsible for misleading plaintiff into position of messenger after he transferred to New York City when HR Generalist Patricia Baroncini) told plaintiff that defendant changed their mind on what they promised plaintiff after he move (or was transferred) from the Washington DC area. Plaintiff was, also, lure to New York under the promise to train fro Team Lead positions and Pitney Bowes changed their mind once plaintiff arrived in New York. Thus making Mr. Atkins limited to only entry-level positions (which included his most recent positions as the copy center / mailroom messenger at White & Case LLP) and no hope of ever moving up in the employment ranks with the company. This was another adverse action, which is one of the retaliatory acts committed against him.

9. The Defendant's activity of deception, which was carried over from falsification of records from Washington DC was 'never' corrected for fraudulent intent, and is another primary reason why the Plaintiff never had a fair chance to ever be considered a candidate for any higher positions within Pitney Bowes. False EPD's eliminated him from the process.

10. Mr. Atkins was the victim of a religious discrimination, by the slur of his supervisor (Brian Covil) "that Jesus Christ was gay" has offended him because Mr. Atkins is a practicing Christian, Bible College student, Deacon in the Baptist Church, and faithful follower of the Christian faith. Mr. Covil knows well that Mr. Atkins is a Christian and respects other people's beliefs to that affect. Pitney

Bowes' policy states that they frown on the act of derogatory comments and drawings of any kind. The role of leadership requires a certain level of responsibility of the individual control and persons that hold these roles are responsible for their actions as well as the company).

11. The plaintiff was asked to take training sessions (which he had done before) and he inquired about the legality of these sessions, and whether they could be used to allow Pitney Bowes to deny him to have the ability to complain about the mistreatment similar to what had been recently experiencing at White & Case LLP. His concern was that these signature sessions (Inside Confidentiality and Inside Ethics) meant that Pitney Bowes could put a lid on any acts of violence that has-been perpetrated against him. His refusal to sign (or take the sessions) were in light of his concerns for his rights to be heard and protected from harm of anything that might have been kept under seal by his managers (as done in Washington DC).

12. Mr. Atkins feared reprisal and just needed protection from signing things that he did not have a clear-cut understanding on (and what it would do with violating any of his current civil or constitutional rights). In light of this, he was terminated under the clause of 'insubordination" (by his manager), which is not an 'at-will' transaction by corporate (understanding that at-will is the action of the employer, not the supervisor).

13. Mr. Atkins feared of some reprisal from supervisors after he told manager (Luis Medina) about time card illegalities and Mr. Atkins remembers how he was treated after he reported it to Pitney Bowes Human Resources in Washington DC (as it relates to the John Kiley letter to Human Resources).

14. The plaintiff believes that Mr. Medina's own reporting record problems[3] would be (and, was) at stake after he mentioned the problems to him  He believes that his termination was motivated by his exposure of the corruptive activities within the

---

[3] Tender of employment - non-attendance to work is reasons  for breach of employment contract Reilly v. Polychrome Corp. 872 F.Supp 1265 (affirmed) 71 F.3 405 (Under New York Law – general principle regarding employers duty of obedience governs executive or supervisors as well as those in subordinate positions.

copy center. (Whistle blowing on time card fraud[4]). Additional to this falsification of records to steal monies from the company, and client, the reputation and the responsibility is placed on the manager to control things in a proper manner.

15. The continued name-calling, by supervisor (Brian Covil) was a motivating factor in having plaintiff terminated (as he continued calling Mr. Atkins 'useless'). In addition to this, this supervisor was telling the plaintiff's coworkers-that the plaintiff did no work at all (as mentioned by coworkers). Several of the firm's employees told plaintiff that they did not believe the same about plaintiff.

16. After a lengthy time of the above activities (#12) the plaintiff was transferred to the mailroom[5] because (as plaintiff states) that supervisor (Brian Covil) request that the manager (Luis Medina) remove plaintiff out of the copy center because he irritated him (which included his reading his Bible in the tab room and his inability to handle his commands). Brian's presence, in the mailroom, created a position of 'intimidations, as he would grin at Mr. Atkins and ask the mailroom supervisor if she had someone take up copy jobs from the copy center. Mr. Covil's presence made it rather hard to survive, along with the stress brought about due to his intimidating presence, for me in the mailroom after I was transferred there.

17. Even, when there was overtime he did not want the plaintiff over in the copy center so they 'never' asked the plaintiff to work any copy center overtime[6].

18. The plaintiff has not allowed the privilege in participating in earning any overtime (since many violations[7] happen during those hours, things like misusing the

---

[4] These misrepresentations take on the same properties as embezzlement – "the crime of taking (obtaining) money by false pretense, although akin to embezzlement differs from embezzlement in that is a fraudulent misappropriation of property which was lawfully obtained, whereas obtaining money or property by false pretenses is a unlawful taking of property in the first instance pursuant to a fraudulent representation (State v. Quinn 245 Iowa 846, 164 N.W.2d 33, 43 A.L.R.2d 1240

[5] Another retaliation move (reassignment affecting prospects for promotion) OSHA-Whistle blowing actions of retaliation Adverse employment actions - Under acts of discrimination, which also includes demotions, firing and laying offs Though I stay with this transfer I was not happy about because it incur heavy lifting and much walking around the firm, and being over sixty years of age, I thought that some of the younger employees could handle most of the heavy lifting (but, they did not)

[6] More adverse effect of complaining about the bad practices in the copy center (cheating on overtime logging by supervisors) – additional falsification of records

[7] However, we have signed a company pledge to refrain from misuse of computers the supervisors lead in the miss use – watching Football Super Bowl on computers during major overtime project.

computers (watching the Super Bowl and other sporting events, which were not work, related).

19. Defendant discriminated against other qualified African America males when they were released from White & Case; later Brian Covil (a Caucasian male) was promoted to the position of Team Lead (from the position of Customer Service Associate). The plaintiff, also, possesses background to have been a candidate for that position that promised training sessions was denied, and would have qualified him for (not withstanding having his true employment history available to him at Pitney Bowes)

20. The defendant feared that the plaintiff would have discovered the many false emails[8], and other documents[9] placed in his file that has threatened his reputation ( that was possibly placed there for future damage to him).. In addition to thus, they have prevented him from viewing his files even though company's policy allows it to be done by requesting the viewing through your manager first. This is posted in the most recent 2008 HR Manual issued.  .

21. Mailroom supervisor, Mr. Jerry Lester, physically assaulted the plaintiff without just cause and his manager (Mr. Luis Medina) attempted to coerce Mr. Atkins into writing a letter[10] stating the incident 'never happened'. Upon Mr. Atkins refusing to do so, his manager (Luis Medina) told Mr. Atkins that he was very upset with him and he did not appreciate plaintiff not following through with plaintiff keeping his coworkers' safety in at heart. Mr. Atkins' manager reported no official record of this incident in writing, nor did his human resources department do likewise (as handbook requires).

---

[8] Plaintiff made aware to these emails on day he sat down with manager (Luis Medina) and supervisor (Brian Covil), and he was surprised that such a thing was happening. Mr. Atkins suspected that they might be in his employee files and needed to verify they existence. On October 06, 2010 (date stamped from 10/05/2012 at the time of 9:44 pm), where he was being accused of some outrageous, and offensive, comments by supervisor). At the time of conversation stated, plaintiff was talking to an attorney (Tracy Brown) of the Cochran Law Firm, concerning her being able to help him

[9] This would include any of the remarks made, concerning manager accusing plaintiff of threatening him with the names and statement of any witnesses making any acclaimed remarks to this effect.

[10] The letter which plaintiff was writing was one which manager would use to help him address corporate with his request to review his employment files. He mention that he (Mr. Medina) would check the letter so that I (plaintiff) was using the correct format in addressing the issues necessary to get better results from corporate officials in charge. Mr. Medina, later, changed what he needed plaintiff to write and plaintiff refused to make a wrong request defeating his civil rights as a victim of a violent act against him.

22. An injury to the eye[11] (which later led to an eye surgery a couple of weeks later) has left Mr. Atkins stuck with the payment of its bill and an ongoing need for treatment by Lenox Hill Hospital. The failure of making the report on the physical assault leave plaintiff responsible for payment of this injury received inadvertently from the assault and battery violation, and making manager violation of company policy in making out reports on incidents.

23. Mr. Luis Medina (copy center manager) had been seen stealing personal financial profiles of partners and has taken them home on two occasions  and these copy jobs are both marked 'highly confidential' by client. I mentioned this fact to White & Case's chief financial administrator (a Mr. Victor Nunez) in a letter when I returned my White & Case picture identification badge after I terminated from the services of Pitney Bowes Management Services (at that location).

24. The plaintiff was the victim of another false allegation made against him, as manager (Luis Medina) told him that the plaintiff had made threats against him. Mr. Medina claimed that members of his staff came to him with some allegations about the plaintiff. Mr. Medina then said that he did not feel safe around the plaintiff, and Mr. Medina sent the plaintiff home in fear that these allegations were true (nor mention of the threatening allegations made against Mr. Medina was ever revealed to plaintiff along with the names of his witnesses making these allegations[12]). These allegations continued to damage plaintiff's reputation with persons throughout the firm of White Case LLP.

25. Mr. Atkins was sent home for this so-call threatening situation, and he returned to the worksite of White & Case LLP after several people were out and the human resources manager, Mr. Gerard Frasita, said that they could not find any bodies available in the city and that they needed me to come back to  cover the empty spots at the White & Case LLP worksite (to help them out)

26. Plaintiff has been traumatized by all of this, and he seeks the answers due him for all due pressure brought upon him by these allegations. This is another reason

---

[11]  Hansel v. Sheridan 991 F.Supp. 699 Under NY Law, not negligence, even when physical injury may have been inflicted 'inadvertently'.(once intentional offensive contact has been established, the actor is liable)

[12] This is a another case of plaintiff not being able to be privy to charges against him, and a denial of his civil rights

why he has sought to see what other defaming information placed into his personal files.

27. Mr. Atkins noticed an animated drawing that excluded him from the copy center staff (drawn up by Brian Covil) which stated that it was the newly organized persons on Mr. Luis Medina copy center team which had excluded him (since he was still a apart of the copy center at that time). This bothered Mr. Atkins, but it seem to indicated that the plaintiff was about to be eliminated from the copy center. This was inappropriate, and against company policy

28. The plaintiff refused to belong to copy center gambling team (another action prohibit by company policy concerning gambling activities on the premises)

29. The plaintiff did not violate policy of abusive use of company computers (as did supervisors and other coworkers). He, like the rest, signed a contract to honor client and Pitney Bowes position on any abuse of privilege in using the computers on the premises.

30. The plaintiff reported his 'tardy / do not pay' entries on his time card, and he noticed that many of the supervisors did not follow this same path of corrected actions rules. Moreover, he noticed that they violated many of the other time card rules such as reporting their correct hours of actually work (some lodging overtime when they never punched in, and some signing out their overtime worked when time clocks were working perfectly). In addition to this, on some occasions supervisors did not punching in at all I was called a troublemaker due to this. This was another reason that they retaliated against me due to my whistle blowing activities[13] on fraudulent actions by management within the copy center (and including the evening supervisor in the mailroom). These time cards are kept for three years before they can be destroyed.

31. The plaintiff, also complained about the fact that the once removed employee is not allowed at operate on the premises at the White & Case LLP site under his employable condition with the defendant, and whether the person (Benjamin

---

[13] These actions violate company policy of fraudulent time reporting, which is confirms every pay period when each employee fills out their time emery sheet online (marked "Enter or Modify Your Time". The fact that the manager watches over the final tally of this time makes him responsible to for employee entering their time 'correctly'.

Dock) was an unauthorized person being permitted by Pitney Bowes. And the on many occasions the supervisor (Brian Covil) would attack the plaintiff, and the other supervisor (Fidel Razack) would stand around and say nothing to stop brain from over stepping his authority.

32. Though Pitney Bowes managers assumed that the plaintiff did not take any of the recent sessions involving confidentiality and ethics (because he was being defiant), but they did not realize their responsibility to explain the purpose of the sessions and the scope of coverage these sessions hold to the life of their employee's freedoms (as well as the company). Then it is important for the defendant to make sure that clarity is primarily in explaining these sessions 'full' coverage. (and whether they had 'far-reaching' effects in areas other then what was mentioned by corporate (meaning that employee's freedoms aren't put in jeopardy)

33. The defendant failed to give him the training sessions for the Team Lead position that they used to lure the plaintiff into taking the transfer to New York. This training sessions was essential for plaintiff's ability to move up to the next level of employment in the company (plaintiff did not twist any arms to receive this promise, but the defendant used this type of trickery to escape being seen as unfair in the process to promote plaintiff to the New York City location[14]). The plaintiff was misled into accepting a false promise and is now the victim of more cover-up sessions in disguise. On the other hand, perhaps this type of trickery was planned from the onset of transfer of plaintiff. No time did the defendant allow plaintiff to advance, but the defendant was determined to 'eventually' destroy and relieve the plaintiff of an employment position for some time now

34. Plaintiff, after listening to his therapist, thought that Pitney Bowes' transfer proposal was safe because his therapist told him that it looked good to her (though she has no legal background to advise him on such matters). The

---

[14] Part of plaintiff being lure to the New York City area was the promise of training for the Team Lead duties in the future. After arriving in New York City, he was told (by Senior HR Generalist Patricia Baroncini) that Pitney Bowes had 'changed' their minds on what they promised me and created something different. She instructed Mr. Atkins to apply for the newly created job listing #5150, or 5152). He was told to hurry and apply before someone else applies and gets the position that they created for him. Later, he found out that it was a position as a messenger in the copy center.

plaintiffs'' attorney, Mrs. Adeila Davis, never showed plaintiff, or advised plaintiff on transfer. She, also said that she had not seen evidence that indicated that Pitney Bowes was lying about anything that could see to be damaging to the plaintiff past or future (however, these items of evidence prove different).

35. The plaintiff has been under financial restraints since his termination and now as he continues to face the enormous financial obligations in his pursuit for a quality educator at this point in his life. The educational process, in the Washington DC area, was more affordable; but in New York, he has had to take out large student loans to continue the process started in Washington DC.

36. Unaware, of the difficult maneuvers involved in his transfer, the plaintiff took less money to relocate to New York City (where the cost of living was much higher then living in the Washington DC area) because his attorney, and defendants' (Eric Jackson) told him that this transfer would represent the defendant's ability to forgive plaintiff for troubles and make things better for him (in new surroundings)

37. Convinced, by his therapist, and the attorneys, that Pitney Bowes was being sincere, he trusted their promise and plaintiff found out that defendant lied about everything when he arrived in New York City. Pitney Bowes was fully aware of the true nature of the promises in their settlement offered to the plaintiff (is somewhat like a blank check with no value to it at al). Moreover, because of the fresh start that they promised the plaintiff (which did not exist) he questions their intent in everything that they said thereafter. The plaintiff questions his position on the issue of 'wrongful beneficial exploitation'.

38. Questions on whether the plaintiff had the 'capacity to contract' arises when it comes to plaintiff being under the care of an therapist during his signing settlement contract, and being advised by the same therapist (is not a lawyer). Mr. Atkins did not have full knowledge of the scope of the legal documents regarding his past, or did he have existed and were available to his defense of any contrary comments made about his character or abilities that might be condemning to his defense of his case. The plaintiff's civil rights are at stake, and a matter of important to his reputation.

39. Plaintiff feared challenging the authorities of Pitney Bowes, after transferring to New York, because of the threat that Pitney Bowes representing attorney (Eric Jackson, in Washington DC) told him that after he sign the settlement papers Attorney Jackson stated that Pitney Bowes is would be watching him and if he (Mr. Atkins) attempts to ever challenge them on any future issues they would involve the services of the Department of Justice to take care of him because they have some strong connections with them

40. The defendant (Pitney Bowes Management Services), at Finnegan, Henderson,, Farabow, Garrett, and Dinner LLP, never encouraged any Africa America encouraged to more up. In fact, there no African American leaders at the site, and people like Dale cic not have a major line of education to work there. In fact, leaders like Dale Satterfield only had been in the copy center since being hired by (who had been told 'not touch

41. Plaintiff was been previously employed as a Site Manager during the period between 1991 through 1993 and he lost that position when he applied for another (similar) position at a new site in Baltimore, Maryland. However, after applying for that position, the plaintiff was told that it was not ready when he applied for it and he, therefore, he lost his position of a Site Manager (which should have not happened). Pitney Bowes Management Services HR Generalist told him 'not to worry' because they would find him another when one became available and many years past by without human resources (ever) contacting plaintiff. Since their notice happened the plaintiff became a product of false promised and it continues today. His records were altered (without him knowing) and you can see by their listings[15]. Moreover, his copy of his Site Managers' Card proves that he was eligible for a similar position in the company. Plaintiff is been barred from applying for certain positions because of false EPD[16] are written up on his character (EPD's are known as Employment Performance Discussion or write-ups).  Plaintiff's letter (November 17, 2010) denotes date writing to manager for

---

[15] DA 0188 is an official Site Manager's Card (during 1991 through 1993), and DA 0190 is a document introduced to plaintiff during a session of being 'deposed' by defendant's attorney December 2005. Falsification of records.
[16] DA 0156(b) denotes that 'any' persons straddled with EPD's are not eligible for the position of Team Lead. History of false EPD has damaged plaintiff changes of ever moving up in the company.

request of viewing employee's file folder. Plaintiff states that he understands procedure and is requesting that the viewing be done in order that is set by corporate standards.

42. Plaintiff was targeted for demotion by way of the surplus employment procedures flees EPD's issued, and (as Denise Lloyd said) I did not have the look that the client(s) were looking for (another racial remark ignored by Pitney Bowes Management Services). Plaintiff became a prime individual for Pitney Bowes surplus entry-level positions. Some of the positions that Pitney found for the plaintiff were those such as the one in the mailroom assignment at Dewey Ballantine. Here, Plaintiff had to report directly to the firm's supervisors (at Dewey Ballantine), and is not listed in the contracted labor position either.

43. Plaintiff has also been the victim of a shotgun attack (he felt that one of his previous coworkers was involved because of their statement the next Monday morning during a conversation at work). The event happened days after his whistle blowing activities on his managers in October, of 2002[17].

44. DA 0156 ( c ) - This document clarifies that actions sort by manager, where he had notice and used his ability to cause preventative action on future promotion to Team Lead position of plaintiff (as document DA 0156(b) illustrates that EPD's prohibited future position as a Team Lead – and letter of intent (Team Lead Training) was an hoax.

45. Pitney Bowes managers that never allowed the plaintiff to recover from the injuries acquired previously in Washington DC, along with the damaging records that have followed him to New York City where he has been the victim of fraudulent additional records. The plaintiff has never been able to re-establish a reasonable level of employment as manager (never held since 1993). Even today, when applying for similar positions at other similar corporation, the plaintiff is not able to qualify for the positions due to his not doing those duties in the recent past.

---

[17] Records are available at the Eastover, Police Department (Washington DC / Maryland border. And, an emergency hospital record at The Greater South Eastern General Hospital, in Washington DC [on the night of October 21(2002)] A Sunday morning., and this was days after I blew the whistle on manager's corruption.

46.  The plaintiffs' employment reputation had been damaged by Pitney Bowes managers' false accusations of 'sabotage[18]', with the statement of him threatening to damage client - contractor relationship (knowingly withheld by managers' instructions to hold clients work if time line reads ASAP on the copy request . This memo withheld by defendant and was the main impetus behind plaintiff being transferred to surplus level employment (and eventually transferred to New York City.

47. Application for the CSM position at Finnegan, Henderson, Farabow, Garrett and Dunner was flawed because plaintiff never saw job posting, and Pitney Bowes document (survey of staff – given by HR employees) indicated that the of CSM position was an evening position, and both managers same schedules (during day time hours). Plaintiff was never told that the shift of position was evening and defendant recognizes that shifts were 'not' worked (PB 01164) by newly hired manager.

48. Defendant, also, hid the assault of a previous client's employee attack on plaintiff in 1995 by an attorney (Mr. Christopher Barr, an employee of client, and from the law firm of Morgan, Lewis, and Bockius LLP).  No incident report made (another violation of corporate policy)

49. Plaintiff placed into a situation of conspiracy (Denise Lloyd / Pitney Bowes Sr. Manager) and Martha Youngblood (newly hired administrator for Finnegan, Henderson, Farabow, Garrett and Dunner) were friends prior t their relationship at Finnegan. In fact, it was reveled that they were drinking buddies in prior friendship before coming to Finnegan and Henderson (per Donald Clayton – a coworker of Martha Youngblood, when they were employees at Arthur Anderson)[19]

---

[18] PB 00078 – 79. Old documents withheld by Pitney Bowes, which made false statements concerning Mr. Atkins intentions to harm client – contractor relationship. PB 01137 proves that the managers' instructions were the guilty instrument of destruction. Mr. Atkins was falsely accused of infraction, as stated in PB 00078 and PB00079, and the fraudulent transfer out from site- of Finnegan Henderson Farabow Garrett and Dunner hurt Mr. Atkins future and damaged his chances of ever getting another promotion at Pitney Bowes.
[19] This seemed to be a 'conflict in interest' – nothing ever said about this relationship

50. Defendant hid the proof that previous manager (Scott Mackey) was intoxicated during hours of work[20], and the existence of a hostile workplace[21] was in existence at Finnegan, Henderson, Farabow, Garrett, and Dunner LLP. The unwarranted attacks, by Brian Covil, also constitutes a 'hostile' work environment, and nothing was said about the conditions as the other supervisor watched (again, it was not reported in the case in Washington DC).

51. Defendant also hid the facts that manager's coerced[22] employees to lie for him on occasions, and that some employees feared him as he would yell and curse at them also (at Finnegan, Henderson, Farabow, Garrett and Dunner LP).

52. Pitney Bowes, also withheld, or destroyed all of the necessary clients' log-in sheets (at Morgan, Lewis, and Bockius LLP's visitors log sign in sheet[23], and Finnegan, Henderson, Farabow, Garrett, and Dunner LLP's copy center copy job log[24] in sheets), Thus destroying clients record and evidence surrounding their false allegations against plaintiff).

53. Defendant said that the plaintiff did not have a bad employment status, and that defendant used comments from annual reviews to state that his work was deficient. In fact, defendant went as far as to make a fraudulent statement about his work on date of 01/31/1998 (not acknowledging two reviews[25] on that date)

54. Defendant, also lied about June 2002, date of interview and hid time card markings on September date of interview (plaintiff's official copies shows correct date and time of interview, and has falsified records to cover up another lie).

55. Defendant lied about bringing a 'new' Team lead over plaintiff (see DA 0227), and later he was the product of discrimination after he refused to put pressure on plaintiff

---

[20] PB 01119, 1122, 1123, 1134 and DA 0208-0213
[21] Ibid, (especially PB 01134)
[22] PB 01165 (DA 0158)
[23] DA 0236-239
[24] DA 0179-186
[25] Two document refute weigh of the 'falsely' stated document – incrimination on false hope to bury plaintiff under bad performance ratings Meyers v. Werger (CA.2 NY) 683 F.2 723 One document acknowledging plaintiff's good work and request pay increase, and second document is HR form installing increase.

56. Defendant hid information about Mr. Plaintiff's position as Site Manager (see Card[26]) and they falsified his records with position of Customer Service Representative, and Lead during established time when he occupied the position of Manager. It was during the period during 1991 through 1993, and Pitney Bowes never gave plaintiff credit for time served under managerial title (when he save the site of Piper & Marbury LLP when previous manager was caught stealing time from client). This is another violation of company policy concerning falsification of records.

57. Defendant never admitted to plaintiff being spat on by manager during his intoxicated state (as defendant fail to acknowledge alcohol use by managers, but witnesses admitted use and his temper[27] during use) and one employee admitted that manager (Scott Mackey) coerced her to lie

58. Defendant hid the fact that manager (Scott Mackey) bragged about his ability to fire persons without going through HR process (and was informed that persons with EPD's would not become Team Leads (DA 0156 – 05/23/2003) #050803.doc – relating to his 05/08/2003 comment in copy center – to staff

59. Defendant never mentions that manager coerced persons to lie above happenings at Finnegan, Henderson, Farabow, Garrett and Dunner LLP[28], just as defendant lied about manager being intoxicated during work hours (see the many pages of proof)

1981
(Count I)

Plaintiff re-alleges the allegations of 1 through 58, and incorporates them by references herein.

60. Plaintiff was an employee of Pitney Bowes and therefore had an implied contract pursuant to the policies and procedures. Plaintiff was treated differently under implied contract due to both his race and religious practices.

---

[26] DA 0188 a copy of plaintiff's official Site Manager's Card (issued in 1991, by account manager Lisa Demetris)  Evidence – Litigation documents as adjudicative facts or evidence (Meyers v. Werger (CA.2 NY) 623 F.2d 723  [see documents DA 0236-239
[27] PB 01134 (states that manager cursed, and insulted people during hours of employment (DA 0210)
[28] Scott Mackey attempted to coerce employee to lie about things that went on at site (see PB 01165)

61. Plaintiff is a member of a protected class and the Defendants failed to promote him based on his race, and treated him with disdain because of his religion and whistle blowing activities.

62. Plaintiff requested clear understanding of use of training sessions and was denied access to their 'full scope of coverage' and these sessions were used to terminate plaintiff without 'just cause, whereas plaintiff was denied training session promised to him upon transfer to New York and was denied his civil rights to the opportunity to advance through such training[29]'

63. Plaintiff was a victim of assault and Defendant sort to cover up incident and requested Plaintiff to lie about what had occurred to protect Pitney Bowes' reputation

64. Plaintiff feared that training sessions could be used as a tool to cover up assault, and other infractions against him.

65. Defendant violated its own rule allowing employees the review of personal files, and plaintiff made the request in order to protect himself from the defendant's unwarranted alteration of the truth (in his files) and the risk of being lied on by defendant to terminate him without due cause.

66. The plaintiff has discovered why he has been denied all possible promotions in the past, and plaintiff had fear that past violations of the defendant has caused this action to be historically connected to many other false allegations by the defendant as a continued effort to root him out and damage his life forever. A greater concern for the truth should have been placed on plaintiff's innocence and his sake to allow him to review his files to have study them to find any false documentation which might have been put in them and the plaintiff believes that one of the purposes of his termination was that his discovery damaging documents might allow him to see the falsehoods aimed at his destruction

---

[29] Under Title VII 1981 Fact that terminated African America employee's former employment was at will under New York Law did not preclude her from bringing action against former employer under 1981, which guaranteed 'equal rights' to make contracts, to her to promise to perform work for employer, as consideration for employer promising to pay , was contract and relationship was no less contractual because it was at will, abrogating  Bascomb v. Smith Barney, Inc. 1999 , and Lauture v. International Business Machine Corporation., C.A.2 (N.Y.) 2000 – 216 F.3D, 258

67. Plaintiff knows that discovering the theft of supervisors, and manager, on posting wrong time worked stop the process of making bad reports would allow corporate to see the criminal activity of their copy center, and how they used trickery to budget their operation ( to help them steal more money through bad entries and moving personnel around to justice cost of operation)

68. Plaintiff believes that copy center manager kept him on the copy centers' budget and placed him into the mailroom (not budgeted as the copy center was) to redirect billing time (and cost) billable to the client

Note: Race (origin) and religion (choice) are entities that we all have, and the law 'provides' protection for every citizen of this country the rights to practice their beliefs in harmony and in peace. No one has the right to infringe, or reject other peoples' freedom because they practice differently. Thus, rendering us to the constitutional and civil rights as being as precious and valued entities of our society and those who practice otherwise break the laws of this nation whenever they violate other people's rights (whether it is a person or corporation).

## 1983

### (Count II)

69. Plaintiff re-alleges allegations 1 through 58, and incorporates them by references herein,

70. Plaintiff engaged in a statutorily protected activity by filing EEO claims of discrimination, whistle blowing claims unauthorized employment practices.

71. Defendants Luis Medina, Brian Covil, Fidel Razack, and Jerry Lester, and Human Resources manager Gerard Frassita (in New York City office of Pitney Bowes Management Services), are recent parties that the plaintiff has been made aware of their wrongful actions against the plaintiff (after their treatment become known by plaintiff and had become victim to their false charges of threat, demotion, intimidation, and exploitation)

72. Plaintiff sent human resources department generalist letters written in his defense of manager (and supervisors) inappropriate treatment and they ignored by human resource managers (after they had reviewed these previous written letters). Plaintiff felt that they never were concern about his safety and other violations

against him. His treatment, by manager (Luis Medina), was criminal (concerning the false (alleged) threat and things should have been handled better by defendant's human resource officers. And, that includes (both) threats and the testimonies of his witnesses. The threats should have been made known to plaintiff if a threat was made. The act of management hid the evidence and ignored the threat to the plaintiff's reputation, his right to know what he was accused of saying was never addressed, and plaintiff's rights were violated.

73. Plaintiff did not trust management after he requested that they explain the 'true' or 'full' scope of the training sessions, and they refused to do so. He feared falling prey to another scheme of the defendant (as he had in the past).

74. Plaintiff suffered similar treatment prior to his transfer to New York City, in Washington DC, where defendants Scott Mackey and Denise Lloyd were made aware of plaintiff's actions and  plaintiff was framed by these manager by using clients' name[30] in blaming plaintiff for error that ended up in his transfer from site of Finnegan, Henderson, Farabow, Garrett and Dunner LLP.

75. Defendant was denied position of Customer Service Manager, and the defendant hid the fact that the position was an evening position and plaintiff never saw the job posting and was not aware of the shift that this position was requesting

76. The plaintiff was transferred to New York City in the response to an error[31] made by the defendant's own managers and this transfer was done as an act of  false pretense. And after coming to New York, the defendant cancelled out on their promise to train plaintiff (the training program to advance plaintiff for future consideration for the team lead position). This has placed plaintiff under undue duress and he has been struggling with his termination since leaving White & Case LLP.

---

[30] See PB 00078 and 00079 for manager accusing plaintiff as 'trying to sabotage operations". And, then see manager's instructions on PB 01137 instructing all operators to hold any copy jobs 'marked' ASAP. Plaintiff was blamed for delay, when it was their newly hired employee that followed managers instructions and held up copy job when clients' employee failed to change her instructions to 'rush [see PB 00671]

[31] Again, transactions in Washington DC, and the defendant making false accusations cause plaintiff to be framed and transferred in order to avoid guilt.

77. Plaintiff remembers hearing copy center manager (Luis Medina) telling his staff, on several occasions, that they (?) were working on something that would get rid of the plaintiff and he asked and his staff them to "just wait" .

78. As a results his calculated efforts, Mr. Medina finally terminated plaintiff without answering his question on the scope of coverage that training sessions results might have on his future (and he inquired with Human Resources and got no answer either).

79. Plaintiff started to receive a reprimand in lure of email created by supervisor[32] and one possible reprimand was actions taken by manager, when manager sent him home for a false accusation concerning threat to manager (and firm).

80. The plaintiff was eventually transferred out of the copy center and sent to the mailroom for good to aided supervisor (Brian Covil) request of 'getting rid of him" because he wanted plaintiff away from him (though, being in the mailroom only meant 'partially out of his sight').

81. Furthermore, Plaintiff's transfer from the copy center was motivated by a religious discriminatory action, and after the religious slur (by supervisor) the harmed, the plaintiff the supervisor mad when plaintiff complained to manager about slur made about Jesus Christ. The plaintiff was transferred to mailroom in lure of that action and others.

82. Defendant (manager Luis Medina) was motivated to remove plaintiff after the exposure of corrupted time card record keeping (and practices in the copy center).

83. In addition to the previous offenses that my supervisors, and manager, had committed against me I file this suit against my supervisors (Brian Covil, Fidel Razack) and Mr. Medina, who have realized that their mounting concerns about the plaintiff (and their frustrations) were concerning the exposure of their faulty report about the plaintiff to hide their theft and wrongdoings. And their reports were designed to deflect their fraudulent activities of fraudulent time card entries that might disappear after plaintiff is gone and removed from site of White & Case LLP).

---

[32] These emails were originally revealed when he reported, to manager, that supervisor made his initial comment about "Jesus Christ being gay'.

84. Plaintiff believes that defendant continued to carry offenses against him from previous dealings in Washington DC. In the lure of the plaintiff, and they[33] continued to create additional false information about plaintiff's work history in New York. Their previous false-recorded charges made against plaintiff (in the Washington DC office) have destroyed every chance for plaintiff to succeed in this company. And the plaintiff feels that this is why he was denied access to his employee records (as permitted by company's policy).and other employment opportunities.

85. The defendant has taken many steps to cover up their trail of mistakes, lies, and false allegations. It is the plaintiff's opinion that they have even made sure that their witnesses will have some type of memory lapse; but documented evidence does not lie. The fact that they took the time to falsify so many things proves that they have run an illegal operation for years but the defendant has the money to cover up, frame, and destroy many lives.

86. Plaintiffs' initial transfer from Washington DC has cause the plaintiff much hardship in living arrangements and this termination has damaged the plaintiff life and has rendered him to homelessness.

Note: The workplace is a place where fear of hatred and prejudice does not belong, and those whom think that their hostile way should reign supreme are wrong and the people who practice hostility and oppression have the wrong message. Oppression is a crime of passion, it kills the spirit of this country, and it robs everyone around them. Rules of fairness and justice should reign supreme over hatred and malice. This is the core belief of this nation (One nation for all, with liberty and justice).

## Title VII Discrimination
### (Count III)

87. Plaintiff re-allege allegations 1 through 58, and incorporates them by references herein,

---

[33] This is part of the corporate attempt to finally destroy plaintiff for making reports on discriminating remarks and actions against him in Washington DC. Plaintiff's records will not be cleaned up because they framed plaintiff and attempt to disgrace him for error that their manager made. PB 01137 document clearing plaintiff, but defendant kept it quiet to protect themselves from blame

88. Plaintiff engages in a statutory protected activity when filing an EEO claim against defendant concerning intimidating acts against him during his employment at Pitney Bowes (White & Case LLP location).

89. Plaintiff was not looked upon in any promotable status, by manager, and was past over for the Team Lead training (which would have possibly led to the position of Team Lead). And, another Caucasian male was given the position after being a Customer Service Associate, also, after other qualified African American males were released from Pitney Bowes copy center, at White & Case LLP..

90. Plaintiff was physically harassed by the evening supervisor in the mailroom, and he was asked to deny that the action ever happened (by his manager ), and when plaintiff said no his manager (Luis Medina) got upset when plaintiff did not agree to give up his rights to complaint about the mistreatment received from defendant's supervisors and manager. The plaintiff has high regards for his safety, health, and future wellbeing.

91. For the Plaintiff, this treatment denotes only one event in an ongoing series[34] of events of wrongful and intimidating[35] acts against him (by the defendant) in New York. It has been the harassing treatment from the copy center leadership, and the physical abuse in the mailroom that has this plaintiff at odds with this defendant trying to cover-up its wrongful handling of plaintiff

92. Plaintiff was transferred out from the copy center, and out from under supervisor (Brian Covil) after his urging manager to remove plaintiff from the copy center because he has had enough of him.  And, the same supervisor told other employees that plaintiff did no work at all and was lazy and useless

93. Plaintiff believes that the defendants' past discriminatory actions was, and has, never dealt with by human resources, as they turned their heads of acts in

---

[34] McAdoo v. Lane N.D.Ill. 1983 564 F.Supp. 1215,affirmed 774 F.2d 1166 – Course of conduct designed to harass, humiliate and frustrate parole officers performance of his duties in a deliberate and calculated attempt to remove him from his position was actionable 'deprivation' of property within the meaning of this section )Title VII Sec. 1983) (Note 1807)

[35] Constructive discharge and civil rights claims did not require showing of subjective intent by employer to force employee to quit, so long as a reasonable person would view working conditions as intolerable Pierce v. Federal Express Corporation D. Colo. 1987 660 F.Supp 1388(Constructive Discharge, discharge of employer (Note 507)

Washington DC, and he same (human resource[36]) leadership was determined to get rid of plaintiff in New York. He believes that his employment history had been altered to make sure that he never be promoted to any position at the managerial level for the rest of his employment life this employer.

94. Defendant previously, noted that many of the defendants' supervisors were unqualified for many of the tasks assigned to them and that their training procedures lack to legislative portion (standard of practices set by congress mandates (as stated Saharanes – Oxley bills of corporate standards), as memo states).

95. Defendant's concern for justice lies in their using their own clients' name to hide behind their prejudice practices and African American males have been discriminated against during the process of promotion to managerial positions in Pitney Bowes Management Services sites (as of late, and before). Plaintiff complained, and wrote numerous letters to manager about concerns and violations against him. He believed they were not answered because manager discriminated against him also, and that manager is afraid to uncover his own faulty behavior[37]. These is a possibility that the manager (Mr. Medina) never addresses these issues with human resources, or if he did then human resources drug their feet in lure of the safety of their employee's working environment

96. The Defendant did not worry about plaintiff ability to gain suitable employment at his current age of sixty-three years old, and the defendant sort to frustrate plaintiff in finding suitable employment at his age by the continue load of work to lift while in the mailroom. The young males employees did not life as much work as the older employees and had attendance problems (but manager never paid much attention to those things).He was, and has been, targeting plaintiff out for some time before terminating him

---

[36] The mention of the name Mr. Gerard Frassita was connected to plaintiff's removal from Washington DC, and plaintiff never knew him while he (plaintiff) worked in Washington DC; but plaintiff became acquainted with Mr. Frassita once he came to New York. He is one the New York City area Operational Managers, for Pitney Bowes Management Services.

[37] This would reference to his tardy attendance, where he comes to work (in the recent past) from two to three days a week. Building's (1155 Avenue of America) could prove what plaintiff is claiming. His supervisors have been covering for his tardiness and he watches their backs.

97. Manager, Luis Medina< always wanted plaintiff to bow down before him  and this became eminent when manager bragged how he could read a book in one day with full comprehension  He, then asked plaintiff whether he was impressed by that and plaintiff responded 'no, he wasn't'.

98.  Ever since the defendant had stolen plaintiff identity[38]  and qualifications earned while employed at Pitney Bowes, they have limited plaintiff to being eligible for employment at lower level experience is needed and growth is impossible and then making him the prime candidate for termination..

99. The defendants have used the years of altering plaintiff's employment records to deceive him, and others. And, in the process of doing such, they have prohibited the plaintiff from ever reaching his level of maturity with the company. It has prohibited the plaintiff from applying for higher levels of employment within the company (and elsewhere)[39]. In doing so, many discriminating acts were allowed there revealed which produced many  deceitful measures that have harmed the plaintiffs' life of employment and his ability to existed in a stress free environment. .

100.      The defendant covered up several harmful acts against the plaintiff, over the span of his employment tenure with the company and that constitutes another discriminating act against the plaintiff's life and ability to gain higher status based upon work completed while working for the company. The violent acts against the plaintiff went unreported, which is against company policy. This defendant has violated their rules, and have continued created (and maintained) unsafe working conditions around the plaintiff and the defendant has covered these facts up for years, and their own protection have not been a focused concerned on behalf of the plaintiff's health, wellbeing, or frame of mind).

101.      It is important to see that this defendant has discriminated against the plaintiff in so many ways. They have used demotions (surplus assignments), transfers (from Washington Dc to New York, and to the plaintiffs' most recent

---

[38] the posting of his true work experience with Pitney Bowes, which would include his position as Site Manager

[39] See DA 0276 (where other outside companies need persons that have done this level of work with a history of such

transfer from the copy center to the mailroom). All of these actions are nothing more than tactics to keep the plaintiff in entry-level positions, and they never allow him to lead in any capacity. And, up until now, it has worked and no one has been able to see this because most people at Pitney Bowes Management services see is that African American males are not leadership roles, but fit very well in entry-level an position (which denotes African Americans having the inability to meet the required level of accomplishments to lead others.

Note: After seeing young (non-African American) males break the rules at Pitney Bowes (talking about their attendance problems and attitude toward their work) they used the racial profile to motivate others and destroy African Americans. Many of them have gone by the waist side, while others have kept their jobs. Management cannot react out of anger aor prejudice. Hatred of plaintiff and final blow of termination is just one example of what this group (like others) can get away with. Concern for fairness and the plaintiff's wellbeing was not one of the factor that kept him working, but hatred got him fired on a technicality that doesn't explain what truth really means. Laws don't matter because some people have found out how to use the law to do bad, but stealing, discrimination, assaulting people (and more) are not some of those reasons today

## Wrongful Termination
## (Count IV)

102.     Plaintiff re-alleges the allegations of Paragraphs 1 through 56, and incorporates them by references herein.

103.     Plaintiff engage in a statutory activity when filing an EEO claim against Defendant Wrongful Termination against him during his employment at the White & Case LLP location

104.     Plaintiff claims several attacks on him (written, verbally, and physically) that seemed to be getting greater in volume as he continued his work in the mailroom and he realized that these happenings were sorted out to intimidate plaintiff by extending their authority over his peaceful state of mind.

105.     Plaintiff claims that copy center personnel came over to taunted him, as they sat around making jokes about people employed in mailroom and ordering mailroom supervisors to employ mailroom staff to do copy center deliveries (as laughed about it)

106.     Plaintiff stated that supervisor (Brian Covil) often made fun persons sitting in mailroom waiting area (for mailroom messengers) and said that persons sitting there look like they were retarded (and I later became one of them). And, though the copy center never asked the mailroom to help them when plaintiff was in the copy center, they started to instruct us that we had to make deliveries once I was transferred over to the mailroom.

107.     Manager attempted to have plaintiff denounce his assault and lie about incident. When plaintiff refused to write false statement, he was told that he was not cooperating with the safety of the site and that he posed a threat to their security. No incidents were report was made, as company policy dictates, and this failure threatens plaintiff safety (as well as his reputation). The act of coercing plaintiff creates the intended act of having the plaintiff to 'falsify' records for his inability to report incidents as corporate has deem necessary.

108.     Reporting time card violation meant that many violations were kept being covered up by leadership, and the plaintiff became a threat to their violations. The exposure of the leadership's negative character and defendants' inability to be honest about reporting their correct payroll constitutes theft. and more falsification of records that the plaintiff complained about and he became a liability to the operations at White & Case LLP

109.     Exposure to plaintiff's employment records would have exposed more violations and the plaintiff's request placed undue pressure on human resources to produce files or terminate plaintiff to avoid future examination of the undue documents placed in his folder. The plaintiff wanted to make sure that no more false records remain in his employment folder)

110.     Plaintiff's employment records were effected by all false accusations of the wrongful persecution received from Pitney Bowes Management Services Human Resources department in August 2003 when copy center managers' instructions' forced an newly hired employee to follow manager's instruction and delay production of a major color copy job for their client. After doing so, the plaintiff was blamed for error and transferred out of site of Finnegan, Henderson, Farabow, Garrett and Dunner LLP. The plaintiff's future has been on a down

spiral ever since that incident. The defendant has 'never' apologized for the error, but forbids plaintiff from seeing his records that should eliminate and reveal many other damaging errors that have kept the plaintiff down (and have damaged his life forever).

111.     Plaintiff knows that Pitney Bowes possess evidence of any fraudulent content when fraudulent activities (committed by their own managers) and how they falsified blame on plaintiff[40] at Finnegan, Henderson, Farabow, Garrett, and Dunner LLP

112.     Plaintiff see that his termination is a license for defendants to cover-up their violations[41] and their reason to get rid of him without facing racial, and religious discrimination charges. Moreover, the defendant feels relieved that past assault charges might be resolved by plaintiff being gone. He, also, feared taking the two training sessions without clearance from human resources because he had suffered from many cover ups in the past, and he felt that all of these recent events might be falsely used against him (instead of against those responsible them). These infractions against him might (again) be covered up with the use of confidentiality session.

113.     Plaintiff knows that his financial situation has been severely damaged since his termination and the defendant has (possibly) used his absence to steal more monies from budgeted time to site's operations and has used it as an avenue to spread his salary to other workers.

114.     Plaintiff believes that his termination was another effort of defendant to add increasingly mental pressure on plaintiff (as it was when he was removed from his previous site of employment in Washington DC).And the use of termination of services with the use of another false employment report about the plaintiff (which limited him to entry level employment and a future at the age of sixty three years old, and nearing the age of retirement)

---

[40] See documentation (PB 00887, 00078-79,09/07/2003 letter to HR, PB 00885,PB 01137,PB o0215, and PB 00671 package in tab
[41] After the defendant realized their false reports were going to be exposed they conspired together and plotted to terminate plaintiff

115.    The plaintiff has tried to demonstrate his loyalty, to the company over the years, but he has been the victim of crooked schemes (by managers) and he has suffered by losing his ability to gain higher employment status and having to deal with more of these false charges about his work production during his tenure and finally losing his job. The plaintiff's future was destroyed by all of the defendant's illegal schemes. And the plaintiff seeks to live, as he believes how he should live after years of loyal service to the company.

116.    Since, this defendant was not able to break the plaintiff's will they decided to terminate him in order to demonstrate their control over his life and future. This termination was a mean and nasty show of action against someone that has 'always' followed the instructions of the company. But, through some treacherous acts of injustice, they (the defendant) finally terminated the plaintiff to show that they were in control of his demeanor and break his spirit. This was both illegal and unjust (especially since the manager neither in his copy center, or in the human resources department 'never' addressed his requests of the training sessions with a full explanation). The violation of their unwillingness to explain the scope of these sessions was a measure used to destroy this plaintiff's hopes and dreams of in a fair and just working environment.

Note: I have said all that I believe that I needed to say to this point. It is my hope, and prayers that justice reigns today and those whom have wronged the plaintiff pay for the transgressions. It is now up to justice itself.

Dated this 16 day July 2012

Daniel G. Atkins
8-10 27th Ave Apt. 302
Astoria, New York. 11102
(Pro Se – Plaintiff)

PDF Document Archive
[Exhibited Documents]

Tab "A"
[Filing information on charges against Plaintiff]
[Range DA 0001 – DA 0018]

- EEOC Filing Document (520-2012-01211) Dated February 07, 2012 (Charge of Discrimination)
- EEOC Notice of Right to Sue Document April 26, 3012
- Document from Human Resources (8/18/2011) handed to Daniel – due 08/22/2012
- First CAP (Corrective Action Process From (10/17/2011) with comments (2nd page – see explanation)[48]
- Second Cap Corrective action Process Document (12/25/2011 comment on page two)
- Pitney Bowes Data Privacy Information Security Training (Example of the sessions in question)
- Page from FindLaw (description of a 'confidentiality Agreement (definition)
- Personal Review 2009 2010
- Personal review 2010 - 2011

TAB"B"
[Letters and notes from Plaintiff leading up to termination]
[Range DA 0019 – 0041]

- November 11, 2009 Letter Brian Covil religious attack and report to manager
- [2008 HR Manual) Corrective Actions Page (Pitney Bowes Handbook) Pg. 41
- And, newly arranged[49] Copy Center replacement plans [created by Brian and Luis]
- Pitney Bowes Staff (at White & Case LLP) Copy Center and Mailroom
- 0ctober 05, 2010 Defaming Letter (with other false charges[50])

---

[48] The fear of whether signing training session would damage my civil freedoms (seeing Pitney's approach as intimidation to protect their rights to silence of wrongs against me and my rights diminished. My prior sessions taken before any major injuries to character or person. Title VII 20006 (242). This a, also, created a motion of hostile environment as it attempt to adjust situation to one of mixed motive which involves intimidation Sharpe V. MCI Communication Service, S.D. N.Y. 2010 684 F.Supp.2d 394 Civil Rights 1137

[49] This sheet was made just before my transfer to the mailroom and after Brian said that he could not stand working with me. Notice that Daniel was 'replaced' by Gary, and other black (Derrick and Gloria) were not included – age and racism discrimination and this is against Pitney Bowes rules of harass targeting minorities). This picture is derogatory and demeaning to me and any other black persons in the copy center not listed. But, in their ignorance, they these things continued to be ignored by manager and supervisors while they (possibly) continue to operate in this same fashion amongst other unknowing persons of color.

[50] Other charges of not informing supervisor of leaving was false, and error is also inhibited to Fidel Razack doing what he is hired to do (update all vacation days once they had been approved – request date made on 09/24/2010 and Fidel dated receiving this me far after the required time when verbal okay was given)

- September 15, 2011 Time Sheet Certification Document Procedure – Time Card Reporting Confirmation for all employees (includes assaults, derogatory comments, threats and retaliation)
- Harassment Free Environment page (Inside PB Policy page) and 'retaliation Page (and what PB considers retaliation to be)[51]
- Employment at Will Definition[52] (page 6 – PB Employee Handbook), and copy of two payroll payments[53] after termination (indicating that termination 'did not' come from corporate)
- Letter to Department of Labor, and payroll deposited in bank (two separate payments – indicating that corporate did not terminate Mr. Atkins, but supervisor did)
- Pitney Bowes termination notice (01/30/2012 – caused plaintiff to file a 'false' application (answer to question concerning 'owed holiday and vacation pay was falsified (see payment of $369.34 on 3/17/2012)

Tab "C"
[More letters, dealing with infractions by supervisors]
[Range DA 0042 -0083]

Human Resources (HR) Policies (Pitney Bowes Inc. (revised 2008) these 'supersede' all HR Employees Handbooks, or policies prior to 2008
- Standards of Conduct Page (page 70) Reporting to work on time, complying with all Pitney Bowes property usage guidelines, not 'not limited' to, proper usage of computers, emails, and internet[54]
- Vendor Certification of Compliance (Internet / Computer use instructions (for every employee in the building connected to White & Case LLP). 08/10/2009[55]
- Harassment-Free Environment (Including Sexual Harassment) Page 15 (PB Employee's Handbook) Supervisors (including managers) 'must' report complaint of or possible incidents of harassment or discrimination promptly to Human Resources[56]

---

[51] Retaliation 1) sent to mailroom after religious slur incident; and 2) Luis Medina asking Daniel to write letter denouncing his attack by mailroom supervisor (Jerry Lester)

[52] *** This page 'plainly' states that no supervisor has any authority to make any contrary representation to the contrary (must b done on a corporate level of authority) ***

[53] Letter to Department of Labor concerning payroll after questionnaire filled out (unknown payment of 369.00) Mailed February 22, 2012

[54] Both supervisors were 'constant' abusers of this policy (10/05/2010 letter Brian Covil, and Fidel Razack's blunder when sending pornographic pictures firm wide at white & Case LLP). In addition, the ongoing and current internet abuse by staff after warning was issued to entire staff. Super Bowl Sunday infraction.

[55] This rule was 'violated' by staff working the weekend (on overtime project) while they watched the Super Bowl Football Game on computers).

[56] This was another reason for my request to review my employee's files (to see if a copy of any such report was placed, like other like Brian Covil's insulting my religious status through blaspheming Jesus Christ's nature).

- An Example of a Report of Incident, or injury (this document produced in Washington Dc, as it relates to working in an 'un-contracted area and un-contracted'[57] duty by Pitney Bowes).
- March 29, 2006 Training Letter (for the Team Lead Position)
- Recent Annual Reviews (Performance reviews for 2010 and 2011)


TAB D
[Human Resources Policies and letter of promissory to Team Lead]
[Range: DA 0078 – 0083]

[Letters written to manager, and Human Resources, and notes of concern]
- August 31, 2010 – plaintiff notice of time card irregularities being overlooked and manager telling staff to fill out overtime sheets correctly and timely (I mentioned to him whether that meant whether that included supervisors reporting their time correctly also"
- June 25, 2010 – Brian harassment about tab room (and, tabs in draws – assignment to straighter up daily) – and, previous day chart of tabs on June 24,2010
- September 03, 2010 letter to manager (Medina) I am told, by coworker that I am unable to answer telephones because I wasn't able to handle clients request because I was just a messenger
- September 09, 2010 – Brian, violently, addresses plaintiff and does not seem to know when to stop yelling at him. Others (including supervisor Fidel Razack) watched as I was being battered by this supervisor (Brian Covil)
- Brian continues to mock plaintiff ability to make deliveries
- October 06, 2010 – Package of pages – 1] complaint by supervisor (10/05/2010 – lie about plaintiff's conversation and violation for requesting time off. 2] 09/30/2010 statement about needing time off and displeasure with working environment,. 3] Request form made out on 09/24/2010. 4] A copy of calendar And, 6] copy of calendar page prior to plaintiff taking day off (supervisor fails to mark calendar on a timely manner). September 19, 2010 – Note (as you might see) superiors never adjusted date on time clock marked 03/29/2010) in copy center).
- October 06, 2010 – Notice concerning document found in the copy center area (slandered by supervisor)
- November 17, 2010 Transfer to mailroom (per Luis Medina) as temporary move. His excuse was that it would be temporary (another lie)
- November 30, 2010 – letter to Luis medina – clearing up understanding about temporary condition in the mailroom assignment

---

[57] PBMS contracting copy center but employed several persons in mailroom (which were Dewey Ballintine contracted areas). Injury acquired when slipping on wet floor in building during mail pickup (1700 Pennsylvania Ave)

- Fidel, and Brian (copy center supervisors) are starting to request my work from the mailroom – I was told that copy center would handle their own deliveries (Luis Medina). Brian addresses people as 'idiots' during evening shift
- January 07, 20111 – Letter to the manager about my early departure
- February 23, 2011 – letter to manager 'requesting permission to review my employee's files At this time I mention the 'recent' assault by mailroom evening supervisor (February 19, 2011). 3 pgs
- Follow up letter to Manager (Luis Medina)  concerning my re-writing my letter to Human Resources for employee file viewing. And, I this same letter I refused' to denounce the assault by mailroom supervisor. I believe that this is a violation of my civil rights.  (4 pgs)
- June 15, 2011 Manager attempts to send employee to On Press to work for their shift. Employee is excused because client (White & Case LLP) is paying for her shift work in contracted hours. I told her to ask HR what should she do and they told her to just mark "excused day' on her time sheet. White & Case closed office (during her shift) for scheduled repairs in the copy center workspace. (possible conflict of interest)
- Group of letters sent to Human Resources (attn Monty Lopez – HR Generalist) and Gerard Frazzita (Area Director).


TAB "E"
[Policies, Time card violations, Personnel and their moves]
[DA 0084 – 0122]

- Pitney Bowes Business Guidelines Manual – Safeguarding employees and establishing a work environment hazard free
- Standard of Conduct (Reframing from falsifying any company documents and knowledge of falsified document being reported (time cards)
- Page (Entering or Modifying Time) Weekly Time Report Sheet (everyone must fill out)
- Time Cards (falsification (F. Razack, Brian Covil, and Jerry Lester) – No punching out for lunch, some never punched in upon entering workday, signature overtime (time clock working well), and some time card (Jerry Lester) no punch in or out time). And, no tardy (F. Razack), and overtime without lunch hours deducted
- Pitney Bowes payroll 'deduction threat' – sent to plaintiff 12 / 2011 – Tic. 1377549 – Manager did not put payroll okays in (false deduction letter) HR benefits claimed that manager did not enter time until after 12:00 pm deadline so they were looking for me (plaintiff) to send them monies of $353.49. No refund of monies were mentioned by HR benefits person (Money was never sent because mistake was on manager's lateness in entering time) Intimidating factor that bothered plaintiff for some time afterwards
- Letter to manager – concerning attack and his attempt to coerce me into writing a letter denouncing the incident

- Standard of Conduct page (Display proper respect for co-workers) reframing from behavior deemed offensive or undesirable September 10, 2010 Brian Covil attacks plaintiff (while supervisor F. Razack watched and said nothing) Luis Medina steals clients (partners) financial profiles – 3" binder and takes it home – information marked as "Highly Confidential by client
- Article about gambling on the job, and copy of Pitney Bowes Copy Center Lotto Club members
- Chart listing offenses against plaintiff
- Copy Center and Mailroom Staff
- Previous Copy Center Contact Listing[58]
- Copy Center Staff (Prior to Brian Covil)
- Copy Center shifts (prior to Brian Covil)
- Lunch Hour schedules (from Brian Covil) April 2009
- Lou Medina Lunch Schedules – produced by Brian Covil (July 2010)[59]
- More charts (offenses committed)
- October 05, 20102 letter regarding plaintiff making nasty comment and not getting time approved by supervisor[60]
- Copies of visitation to human resources office (04/01, 06, 18/2012 after being sent home by Luis Medina (on false threatening charge) And sent home on 03/30; reported to HR on 04/01 and 08/2012. requested to return to White & Case on 04/18/2012 to be placed back into mailroom because they were short bodies.
- Copy of current (or, one of Lenox Hill Hospital bills) Eye Surgery and after care treatment)

TAB "F"
[ Attorney Letters / Legal Agencies Correspondence]
[DA 0123 – 0133]

- WilnerHale Response letter
- The Cochran Law Firm Response
- Response: Borrelli & Associates, P.L.L.C Response
- Berke-Weiss & Pechman LLP Response
- Letter to Special Assistant to District Attorney [Ms. Lillian Llambelia]
- Email response (from) Assistant District attorney Tom Wornom

---

[58] Two African American (former managers0 removed from site and qualified to become permanent Team Leads or better. Brian Covil (as plaintiff) listed as CSA

[59] Plaintiff, had, previously mentioned (to supervisors) that they were to take lunches also (see their time cards) (trouble here). Plaintiff, also, mention this to manager (Luis Medina)`
October 05, 2010 Attack on plaintiff's character and false comments on vacation day requested (made according to the rules)

[60] Three pages (10/05/2012 letter, Properly requested time off form (stamped dated), and calendar of date requested

TAB "G"
[Medical Bills, Settlement Pages, Team Lead letter, Transfer information
[Range DA 0134 – 162]

[Old Material relevant to current charges and retaliation – from Washington DC]

Most of documents not made know to plaintiff until former attorney was 'fired'

1. Medical Bills (from eye injury obtained during assault by mailroom supervisor
2. Settlement agreement (signed after therapist suggested to do so – attached are copies of the sessions leading from =3/-8/2006, and 03/22/2006. Later 04/05/2006 under instructions of therapist that Pitney Bowes seemed concern with doing plaintiff no harm Capacity to Contract (or understand) the full legal ruminations of this contract  in its full measure – attached are therapist card, appointment and scheduled visit information
3. Verification of treatment of plaintiff (by therapist) on 03/08/2006
4. Complaint filing at the Human Rights department of Washington DC (03/19, 2003)
5. Original Human Rights department filing (09/04/2001)
6. EEOC filing affidavit (connecting to Human Rights filing of -3/-19/2003)
7. Court (U.S. District Court of Washington DC) Closure of Meditation  - picked up by plaintiff (from court) on 04/07/2008
8. Dismissal of case (lied 04/25/2006)
9. Pitney Bowes promising plaintiff training for the Team Lead position (lure to plaintiff for future improvement – this document was taken, and shown, to therapist) DA 0156(a), and job posting for Team Lead position (states that EPD's are reasons for denial of consideration for position (DA 0156(b) Scott Mackey performance
10. da 0156 ©, CSM posting (qualification – at Thompson Hines DA 0156 (D)
11. Training (in plaintiff employee's training transcript) denied and put on hold 05/22/3006
12. July 22, 2006 letter from opposing counsel – his notice that my attorney had been fired and his surprise that I hadn't left Washington DC (attached are copies of transcript from plaintiff's profile and date 'established' as transaction date was 12/31/2006) . Also, transmission of emails from (and to) New York Area Manager concerning schedules relocation


TAB "H"

[Charts and Pitney Bowes exhibits of 'false' claim, and Letter of Determination]
[DA 0163 – 0178]
1. Chart of Pitney Bowes exhibits that falsified their statement made to the contrary of relevant fact. 3 pgs.
2. Letter of determination (from Human Rights of Washington DC) March 2005

- PB 00210 – hostile workplace existed, write ups false, character assassination, enrollment in school was a good claim (since position sort was possibly evening position and plaintiff never saw job posting – meaning that position possibly evening position)
- PB 00211 – retaliation existed and plaintiff was demoted; Plaintiff complained about race, being reason for non selection, because Sr. Manager (Denise Lloyd) stated that plaintiff 'did not have the looks that the client was looking for'';
- PB 00212 false write-ups began to surface at random, manager was intoxicated on many occasions and defendant ignore testimony of other employees, Sept 09, 2003 letter is a response to false charges from PB 01137 (PB 00078-79) sabotage letter) and false blame from manager. PB 01137 is an instruction document created by managers of the copy center)
- PB 00213 Alteration of employment history (denial of position of Site Manager from 1991 through 1993); Opening postings being posted was not done at site (reason that plaintiff never knew what  (possible0 shift position of CSM was being offered; The alteration f employment history caused plaintiff to be seen 'not-qualified' for position due to experience
- Documents dated 01/21/1988 (very controversial, since further view of these 3 individual documents say different things) - documents cancel out the question of truth verses lies). 11/13/1998, 10/07/1999, 09/25/2000, and 09/04/2001 are all employee annual (periodic) reviews, and they are not complaints by defendant. Some of these  comments were not remarks made concerning  employee's performance.(especially 01/31/1998); plaintiff, did mention, to the HR generalist (Tracy) that he had filed a complaint since Pitney Bowes could not solve the discriminating problem that had existed in this situation. In defense of other applicant (Scott Mackey, a Caucasian male) whether he was  qualified was obvious because he had no law firm experience (he was an onset printer and unfamiliar to everything that law firms copy centers do, and how they operate). He was lost when he came to Finnegan, Henderson, Farabow,  Garrett and Dunner LLP. He asked people to help him find things and explain how things are done. He spent most of his time drinking and chasing people around the copy center. His experience, with inside copy centers operations was limited.
- PB 00216 – Plaintiff stated that manager smelled with alcohol (see PB 001119, 1123, 1134, 1149, and other documents included in this file); hostile environment (see PB 01134, and other documents)
- PB 00217 Again, position not listed on job opportunity (because plaintiff never saw posting of position). The post was not seen by plaintiff, but account manager (verbally0 told him to apply and 'never' mentioned if there was any shift for posted position.
- PB 00218 – Employee record alteration proves fatal to plaintiff because he failed to qualify for position, which he had held before for this same employer. And the damage of this still lingers with him today; hostile workplace environment existed (see PB 01134, and other documents) and the defendant lied again; The copy center Manager (Scott Mackey) intimidated plaintiff, spat on him during moments of violent intoxicating rage, he insulted him and more. Pitney Bowes ignored their

own documents proving plaintiffs' truth. The manager humbled plaintiff and told him that even HR could not stop him.

- PB 00219 Reports of the manager's behavior was documented by employee, but human resources ignored plies from persons (August 2003) and stated that plaintiff made things up and that his work was unsatisfactory and had to be removed from worksite.
- PB 00220 Account manager did nothing to stop any harassment (see PB 01156) and turned his head on things,
- PB 00221 Plaintiff was demoted to level lower than Team Lead when Scott Mackey, and Denise Lloyd, brought Larry Butler in to run the operations in the copy center. He has less experience (again) then I did. The assignment of surplus employment did act as a measure to stump my future employment opportunities (as it labeled me as a temporary employee having entry level status and limited to becoming a standard customer service associate (first) before ever moving on to higher levels of employment in the company.(suffering adverse effects of this action).

TAB "I"
[More bad documentation that led to false characterization of plaintiff and demotion]
[DA 0179 – 0213]

- PB 00887 09/23/2003 Letter of Removal from site  - falsely accused of errors leading up to move) – see attached documents)
- PB 00078 – 790 Accused of 'sabotaging' operations
- .09/05/2003 letter requesting client's statement of fact from HR Manager (in Atlanta)
- 09/12/2003 (PB 00885) letter to HR Manager (Washington DC).
- PB 01137 Copy Center Manager's instructions to hold 'all' copy jobs marked ASAP, and to be worked on last.(or held until time permitting).
- PB 00215 Document 'starts off with improper discipline and being removed from his position as Team Lead and placed into a non-supervisory job (clearly states
- PB 00671 Chart – explanation of the actual events as they happened (plaintiff's evidence with defendant's PB markings as evidence – misrepresentation of who the original evidence belonged to and showing that defendant 'knew' what 'really' happened and 'chose to ignore facts'.
- Plaintiff Resume cover sheet
- PB 01152 Plaintiff stating his previous experience to HR Generalist during an interview (prior managerial experience)
- Plaintiff Site Managers card (Pitney Bowes original)
- Finnegan, Henderson, Farabow, Garrett and Dunner LLP (history of employees in the copy center operations since 1997)PB 00892-93 Letter, listing false positions occupied by plaintiff (altered history seen ere) – Pitney Bowes 'never gave' plaintiff raise to match his title and promised to do so when they straightened out their books)-attached, copy of Site Manager's card – see previous documents
- PB 00216 statement about plaintiff's years of experience

- PB 00754-55  Application for Customer Service manager position (debated position) given to plaintiff to fill out after October (2002) – see PB 00755 in order to answer this question these discipline notices had to come prior to application to answer correctly.
- PB 00134 Plaintiff scheduled to go through "Front Line Leadership Training Session and )(successfully completed in September 19, 1997)
- Pitney Bowes Rapid Reward to plaintiff (3 pages 1] announcement of reward, 2]explanation of reward, and 3] return of check from Pitney Bowes management (plaintiff felt that he did not deserve a reward for something that he was being paid to do).
- PB 00063 Pitney Bowes (Re-classification) pay and position adjustment ;letter (announcing promotion) 09/22/1997
- Certificate of Recognition (from Area General Manager – Thomas Benvenuto) Currently chairs one of Pitney Bowes' major global corporate sections (see next page) DA 0207 (A.B)  May 10, 2006 Rewards Letter from corporate DA 0207 (D)
- PB 00057 Pitney Bowes pay adjustment letter (since promotion) 01/31/1998
- PB 00902] allegations that 1] plaintiff duties were changed due t his work performance, 2] Manager, Scott Mackey, never consume alcohol during work hours (and their investigations found 'nothing') see 'Business Ethics and Conduct Page – "Alcohol Consumption" evidence in testimonies PB 01134, PB 01119, and PB 01140PB 01139 [PB 01134, also states that manager cursed at employees on many occasions]

TAB "J"
[More entrapping evidence – concerning (not-so) accuracy of Information]
[Range DA 0214 – 0265]

- Accuracy of Information Page: PB 01165 Scott Mackey coerced employee to lie for him; PB 01164 CSM position was (possibly) an evening position,  and both managers disregarded its assignment because they (both0 worked during morning shift
- Standard of Conduct page (71), - May 20, 2003 Manager (Scott) bragged that he did not have to go through HR to fire someone. Again, 06/17 alcohol use by manager; PB Business Ethics page (mentions that no one is to abuse alcohol on the job and intoxication is no defense; PB 01123 Two Team Leads are responsible to workload; PB 01139 discusses manager involvement with alcohol and cursing episode; PB 01140 more witnesses on manager's alcoholic problem and PB 01119 still more witnesses about alcoholic problem
- July 05, 2002 A women is interviewed for an evening position and she turns it down (per co worker)
- PB 01164 Another interview answer, by HR Generalist, concerning both managers working the same (am) shift
- Letter, from Ardeila Davis (attorney for the plaintiff) stating that plaintiff was demoted (December 16, 2004)
- Memo 04/24/2003 Notice that new Team Lead is appointed (Larry Butler) and he is the only Team Lead (in the copy center) in the morning

- PB 00403 Business Continuation Planning (Chart) listing leadership set up by Denise Lloyd and Scott Mackey
- Defendant's issuance of complaints about plaintiffs character and leadership quality: 01/31/1998 Personnel Change Authorization page PB 00949 (salary adjustment); Performance Review PB oo952; and PB 00951 Requesting that plaintiff's salary be increased and praise for his work ethics. PB 00168-59 another performance review (09/25/1999 – 09/25/2000)
- 04/23/2003 the false memo from Site Manager, James Shaw, concerning the interview being held in June is another deceitful document that the defendants have altered to cover themselves. Their date is listed, as June 2002 is false. in addition, their time sheet does not indicate such. My date (as marked on my time card) was September 26, 2002 (two side copy of time card)
- Pitney Bowes Management Services (Copy Center Performance Standards); Quality Control is an important process; PB 01122 copy operators are given the control over quality checking their 'own' work by managers 05/07/2003; Write up for copy job errors (job was not checked due to instructions from manager) PB 00076; Memo (06/13/2003 Instructions that 'all' copy job go through the quality checking process (this after manager was scrutinized by account manager)
- PB 00886 Surplus assignment 09/09/2003 Dewey Ballantine; December 05, 2003 re-assignment to Dewey Ballantine; Dewey Ballantine ID Badge; January 09, 2004 re-assignment to Dewey Ballantine (PB 00842) mailroom – job description: as office assistant; Pitney Bowes / Dewey Ballantine Service agreement (copy center function 'only', and 'not' contracted mail services); Firm's employee listings (mailroom listed as firm run and names of Dewey Ballantine employees, and copy center has Pitney Bowes employees names) Working in un-contracted area
- Pitney Bowes Mandatory Manager's Training sessions 05/04/2003 Payroll problems and other concerns
- PB 00080 letter from HR manager, concerning performance
- PB 99776 notice concerning overtime paid for punching in and making
- PB pay overtime (of twenty minutes and one half hour on another occasion); 10/01/2002 overtime charge – copy center short staff and plaintiff was on lunch and punched in to help clients that came into copy center); 2 pages
- (Employee Detail History shows that defendant owed plaintiff vacation time and choose not to give it to him 9especially since he was being removed from site) and, a paystub copy, showing that defendant owed plaintiff balance of 162.00 hours of vacation time at the end of the year (2002).


TAB "K"
[More hidden evidence of defendant shielding evidence]
[DA 0266 A – 0276]

- Three letters (November 07, 08, and 09, of 1995) From assault at Morgan, Lewis, and Bockius LLP (where attorney Christopher Barr assaulted plaintiff), and Pitney Bowes 'never' reported this incident to protect themselves and their clients'

reputation.  Counsel attacked plaintiff when he attempted to stop the production of a partner's filing  (Steve McKenzie) by throwing production documents on floor and, wrestling plaintiff to the floor to take to copying machine away from plaintiff..[Notice: These letters, which should be a part of plaintiff's file, have been numbered by Pitney Bowes as evidence – thus, showing that they knew (or reemeber0 that assault existed and they have purposely withheld these documents from being put into file of plaintiff. His viewing of his files should have contained these letters (PB 00389, 00390, 00392, and 00393). No incident report ever written for this incident – hushed up!

- Standard of Conduct page (Da0 0270), and PB 01156 Complaint from coworker (Shirley Booker) comment on place 'being a Hell Hole", and Sr. Manager (Denise Lloyd) saying, "It's either her way, r the highway".  (DA 0271)
- PB 01135 Letter complaining about Team Lead Larry Butler – and, his problems leading as a supervisor (DA 0272), and Larry Butler's complaint about manager PB 01134 (DA 0273) complaining about manager's drinking, cursing, and evil temper and actions against employees (DA 0273)
- October 21/2002 – Kaiser Permente record of hospital visit from 'shut gun' attack (DA 0274 -275) visit to Greater Washington General Hospital, after shut gum attack

LEGEND

## DAMAGES SOUGHT IN SUMMARY JUDGEMENT

1. As for my being the plaintiff, in this matter, I would appreciate to court granting me the total of the sum of $35,000,000.00 for all of my pain and suffering. My reputations (over the years) have been damage beyond the defendant's ability to repair it. Therefore, this is what I openly seek

2. But (Or), if the previous request is not favorably acceptable to the court as the first choice, I seek the following measures of relieve)

    - .Since, Pitney Bowes had (or persuaded) Mr. Atkins that his transfer would be a relief (and it wasn't), Mr. Atkins is asking the court to have Pitney Bowes give him a housing arrangement of his choosing (since he has been in a some-what homeless state since moving to New York) – plaintiff's homeless state was caused by false lure never amounted to much to facilitate and descent housing situation[1] where plaintiff could be comfortable in a reasonable housing situation

    - Pay for his education received since moving here (since previous cost[2] was affordable and out of pocket the defendant pay the current cost amounts in student loans) – Since training was proposed letter of invitation to training not being valid and plaintiff (later) finding out that it was not available (as management offered) the cost of college was greater in New York then what plaintiff had been paying for in Washington DC (plus, PBMS education funds would them a exemption for educational training courses for their employees with tax deductable credit)

    - Payment of medical bill[3], as it related to the eye injury received as a result of assault and battery by mailroom supervisor (Jerry Lester) – Injury related to assault and this is an penalty for the cause of assault and injury acquired in result of confrontation

---

[1] The listing will read – two-family / brick house in the South Jamaica area of Queens, and with no mortgage (in excellent condition from those own by Bank of /America – who owns thousands of 'foreclosed' homes that someone is 'still' occupying and they have already foreclosed on and has someone living there to help keep up the maintenance on. the property.

[2] During my school cost, in the Washington DC, area, was at a level where plaintiff was paying out of pocket rates – compared to the current student loans which plaintiff will have problems paying for in the future

[3] Since, the inadvertent injury happened in lure of the (hidden) assault by mailroom supervisor the plaintiff is (rightfully0 looking for defendant to pay for. (Not withstanding, the future eye treatments needed going forward)

- Retirement[4], at the cost of $75,000.00 annually, (since they have erased him past history and altered it for someone to earn much less that what he might have been earning in the position of Customer Service Manager today at Pitney Bowes). Although, n most cases, a Customer Service Manager, of the same length of time since 1992 would have been making far more than $75,000.00 annually – Since PBMS lied about original position and plaintiff's employment history they should retire him immediately and pay him what he might have earned by now if he got position that he was qualified for/ Attached, is an article in response to this requested amount – which is the cost of living in New York City)

- The allotment of 8.5 million dollars (to go to selected charities[5] of Mr. Atkins' choosing) – Pitney Bowes donates to charities every year and this is a tax deduction so they can afford this request here

- In addition tot he above, I am asking for the allotment of 6.5 million dollars to Mr. Atkins ( for all of his pain, suffering, embarrassment, terror, trauma, the name-calling, the defamation of character, bad write-ups, and for all of the other acts against plaintiff character, health and reputation). For all of the pain

- In addition, the suffering received by plaintiff over the past e=ten years of his employment, as Pitney Bowes lied and cheated their way through the process to protect themselves from prosecution.

---

[4] Since, the plaintiff's employment is no longer wanted and he has serve Pitney Bowes well in the past (plus, the plaintiff nearing the years of retirement) he desires to retire in a comfortable manner, and with the acceptable cost of living for New Yorkers is at $75,000.00 annually. He would desire that the defend ant do so in order to make up for his being negated from the 'fair' practice of promotions and having his employment history erased for their profit.

[5] His is not a poor company, and their ability to fund charities would not be a case of hardship on this company. I think that two churches (that the plaintiff could recommend) would be ideal for the defendant to support in this fashion, and it would not be of any burden to defendant because they give out large funds to charities all of the time.

Special Note:

The court might think that plaintiff's request might seem a bit much, but they are not. Plaintiff realizes how many clients' names that the defendant put in jeopardy when they falsified the plaintiff's name during their acts of deceit. The defendant risked their clients' names, mentioned in this litigated matter, when they ignored the truth about plaintiff attempting to 'sabotage' project (which is clearly demonstrated with their manager's instructions[47] stating to delay any copy job labeled as ASAP_. They took that risk when they allowed lies against plaintiff to be written. They lied when they destroy pertinent evidence (such as clients' logs) to protect themselves form being proved wrong in two particular incidents. They transferred plaintiff to New York City without even thinking about whether they really had any good intentions to play fair with the plaintiff. intentions to extend an opportunities for the plaintiff to advance if he kept his nose clean. Again, they violated during their discourse  The defendant never sort to make out incident reports to protect their employee's health, but chose to disregard company policy to protect themselves from incidents against the plaintiff and violate their own rules. Again, at-will will protect the company against harm when they are legally sound judgment calls. But, at will does not protect that company from wrongdoings (and against criminal negligence.

Ignorance is not an excuse for recklessness. Their clients ought to know that the defendant are acting in an unfavorable manner while conducting business on their premises and could drag them into legal entanglements in the future. Therefore, the plaintiff feels that what he is asking for is sound and not a whole lot compared to what this case what be requiring with an accomplished attorney. In this plaintiff's case he had asked for $150,000,000. In the previous engagement, in Washington DC, plaintiff reencountered fraudulent activities involving Bank of America (and former attorny0 and the lost of $6,000.00. Plaintiff does not wish to include these facts I this litigated matter, but reserves the right to make notice of additional charges that would take this case into another direction, which might indicate more conspiracy matters from this defendants' clients.

---

[47] PB 01137 This document instructs 'all' copy operators, and leaders, to delay (or hold0 any copy job labeled ASAP. The defendant framed plaintiff and transferred him out of site.

Personal statistics

Daniel Graham Atkins Sr.
8-10 27th Ave. Apt 302
Astoria, New York 11102
Email: atkinsdaniel123@hotmail.com, and atkinsdanielsenior@gmail.com
Telephone 347-706-0408
** Also, PO Box 0582, NYC, NY 10116

Social # 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
September 19, 1948 (current age 63 years old)

Employment status: Unemployed since: (01/230/2012
Unemployment Benefits (weekly $349.00)

Expenses:

Rent 1] currently 225.00 bi-weekly to mother for living expenses,
    2] Was previously $300.00 bi-weekly when temporarily staying at my son's
       apartment in Jamaica, Queens (But, I have recently moved to back to Astoria)

Financial Information
[Debit / Credit Cards Information, and other monthly commitments]

Capitol One (2) 5291-4923-3339-6691, 1and 5178-0523-3416-2662
Bank of America (3) Debit 4368-0240-2308-2660; Credit Cards 4888-9360-9357-1853, a
American Express (1)
Chase Bank (checking account #4007670075016348)
Dell Preferred acct #6879-4501-1901-9449-820 (avg. mthly payment of 36.00)
Life Insurance (3) New York Life (80.00 mthly electronic deduction); and loan payment
of $52.94 mthly; Hosp. Accid Insurance. Des. (electron deduction $7.45 mthly); AD
Insurance. DES ($10.22 mthly electronic deduction); and AARP DES: Insurance $31.41
(mthly electronic deduction)
Telephone (Sprint) 756175352 (Avg. mthly $106.00)
Chase Debit 4207-6700-7501-6348 (open balance of $2 952 and payment plan of 80.00
mthly electronic deduction)
Dell Preferred Account 6879450119019449820 (1,090.54) Avg. mthly payment of 37.00
Lenox Hill Hospital (Regional Claims Recovery) Acct 9982552 ($50.00 mthly
payments); plus additional cost for visits (Acct 700376255) balance unknown
Metro Fare Card - $29.00 weekly
Church Tithes (were $65.00 weekly) but currently down to $50.00 and mostly less than
that in current financial slump (from 40.00, 35.00, or 25.00 if possible)
Mel S. S. Harris and Associates LLC Acct 906650-1 $100.00 mthly
Forster & Garbus LLP –VNY40158549049 $40.00 mthly
Macy's payment (avg. 28.00 mthly)

Health / Medical Insurance:

Elmhurst Hospital 900-298-64-99-8 ($20.00 co pay, and $6.00 for prescription)

Religious Statistics

Deacon in Church (New Jerusalem Baptist Church)
122-05 Smith Street, Jamaica New York 11434
Tithes: Envelope #965 Was 65.00 weekly, but now less (from 60.00, 50.00, and some times much less due to financial situation today)

Bible College:

Nyack College   (Senior)
361 Broadway - Class status – senior (need three classes to graduate May 2013)
New York, N.Y.
Student Loans (they are going to kill me)
Transferred from:
1. Maple Springs Baptist Bible College, in Capitol Heights, Maryland,. And out of pocket payment for schooling
2. Prince George's Community College, Largo, Maryland  (out of pocket payment)
3. Cortland State College (SUNY) Cortland, N.Y. (Educational Opportunity Program)

A



Español | Other Languages

## U.S. Equal Employment Opportunity Commission

Enter search terms... | Search

| Home | About EEOC | Employees & Applicants | Employers | Federal Agencies |

| Contact Us |

Office Information

Location & Hours

Jurisdictional Area

Filing A Charge

Timeliness

Mediation Program

Small Business Information

Federal Sector Information

Training and Outreach

State and Local Agencies

FOIA

Home > Field Offices > New York District Office

# New York District Office

**Location:**  33 Whitehall Street, 5th Floor
New York, NY 10004
Phone: 1-800-669-4000

**Phone:**  1-800-669-4000

**Fax:**  212-336-3790

**TTY:**  1-800-669-6820

**Director:**  Kevin J. Berry

**Regional Attorney:**  Elizabeth Grossman

**Office Hours:**  The New York District Office is open Monday-Friday from 9:00 a.m. - 5:00 p.m. Intake hours are Monday - Friday, from 9:00am to 3:00 pm. We encourage you to call our 800 number listed above for information, and pre-screening by an intake information representative before you visit our office.

Privacy Policy | Disclaimer | USA.Gov





Español | Other Languages

## U.S. Equal Employment Opportunity Commission

| Enter search terms... | Search |

| Home | About EEOC | Employees & Applicants | Employers |
| Federal Agencies | Contact Us |

**Office Information**

Location & Hours

Jurisdictional Area

Filing A Charge

Timeliness

Mediation Program

Small Business Information

Federal Sector Information

Training and Outreach

State and Local Agencies

FOIA

Home > Field Offices > New York District Office

# New York District Office

**Location:** 33 Whitehall Street, 5th Floor
New York, NY 10004
Phone: 1-800-669-4000

**Phone:** 1-800-669-4000

**Fax:** 212-336-3790

**TTY:** 1-800-669-6820

**Director:** Kevin J. Berry

**Regional Attorney:** Elizabeth Grossman

**Office Hours:** The New York District Office is open Monday-Friday from 9:00 a.m. - 5:00 p.m. Intake hours are Monday - Friday, from 9:00am to 3:00 pm. We encourage you to call our 800 number listed above for information, and pre-screening by an intake information representative before you visit our office.

Privacy Policy | Disclaimer | USA.Gov

*1-888-201-8174*

*PitNey Bowes*

MAJOR contact
( Headquarters )

Andrew R. Gold
Dir. Human Resources
PBMS
203-326-6460 - phone
andrew.gold@~~pb~~ pb.com

Stamford, CT.
1 Elmscroft

PitNey Bowes
Morty Lopez - Haynes
HR Generalist
T. 917-351-2919
C. 718-607-2175
F. 203-546-1939

Local office

1 Penn PLAZA
30th flr.
NYC. NY

**DA 0002**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622
General FAX (212) 336-3625

**BY US MAIL**

Mr. Daniel Atkins
P.O. Box 0582
New York, New York 10016

RE:                    Daniel Atkins v. Pitney Bowes Mgnt. /White & Case, LLP
EEOC Charge No.:              520- 2012-01211

Dear Mr. Atkins:

This office is in receipt of your request for a *Notice of Right to Sue* on the above-referenced charge.

Ordinarily, a charging party or his/her counsel is not entitled to receive a *Notice of Right to Sue* upon request until the charge has been pending with the EEOC for at least 180 days. However, an early *Notice of Right to Sue* is authorized by 29 C.F.R. § 1601.28(a)(2) if the Director determines that the Commission will not be able to complete its administrative process within 180 days of the date the charge was filed.

We have reviewed all of the circumstances of this case and have determined that issuing you the requested *Notice of Right to Sue* is warranted at this time. Specifically, given our office's current workload, we have concluded that the EEOC will be unable to complete the processing of this charge within 180 days of the date the charge was filed.

Enclosed is your *Notice of Right to Sue*. If you have any questions, please contact Investigator Guest at (212) 336-3620.

On Behalf of the Commission:

*Kevin J. Berry*  and for              APR 2 6 2012

Kevin J. Berry, *District Director*              _____
New York District Office                          Date

Enclosure

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Daniel Atkins**<br>**P.O. Box 0582**<br>**New York, NY 10016** | From: **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2012-01211** | **Arlean C. Nieto,**<br>**Supervisory Investigator** | **(212) 336-3676** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> **of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐    More than 180 days have passed since the filing of this charge.

☒    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒    The EEOC is terminating its processing of this charge.

☐    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐    The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐    The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Kevin J. Berry* ad
for

**Kevin J. Berry,**
**District Director**

APR 2 6 2012

*(Date Mailed)*

Enclosures(s)

cc:    **Attn**
**Director of Human Resources**
**PITNEY BOWES MANAGEMENT/WHITE & CASE LLP**
**1 Penn Plaza**
**New York, NY 10116**

Enclosure with EEOC

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
New York District Office
33 Whitehall Street, 5th Fl
New York, N.Y. 10004

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

1001639900

FIRST CLASS



02 1R                    $ 00.45⁰
0002003026    APR 26 2012
MAILED FROM ZIP CODE 10004



## Access to Personnel Files

*Revised January 1, 2004*

*Access to employee personnel files is restricted to employees with authorization.*

### Overview

Pitney Bowes maintains a personnel file on each employee that may include such information as the employee's:

**Medical Information**

*All medical information relating to an employee is maintained separately from the employee's personnel file.*

- ❖ Job application
- ❖ Resume
- ❖ Records of training
- ❖ Documentation of performance appraisals
- ❖ Disciplinary actions
- ❖ Commendations
- ❖ Salary increases
- ❖ Other employment records

### Guidelines

Personnel files are the property of Pitney Bowes and access to the information they contain is restricted. **Generally, only Pitney Bowes supervisors and Human Resources professionals with a legitimate reason may review information in a personnel file.**

**Special Notes**

If you wish to review your own personnel file, you may contact your Human Resources Generalist.

- ❖ With reasonable advance notice, you may review your own personnel file at Pitney Bowes in the presence of a supervisor or Human Resources Generalist.
- ❖ You may not remove any document from the file. — *Altered documents*
- ❖ You may add a response to any document in your personnel file. *and other missing files or site managers records not there.*
- ❖ You may request a copy of your file from your HR Generalist.

*(Attorney Davis 'never' asked for invoiced proof of Pitney Bowes managers (Ard mgr).*



For updated policy information, please check
the new employee portal - Inside PB - Policies & Procedures - Human Resources or contact
the HR Operations Service Center at 1-770-952-361

DA 0003

Home Page     US Home

Home Page : One Company : News : Enterprise Wire : 27 June '08 - Special Announcement from Murray Martin Regarding PBMS

Customize Blocks

Search:

Advanced Search

27 June '08 – Special Announcement from Murray Martin Regarding PBMS !  SET ALE

# 27 June '08 – Special Announcement from Murray Martin Regarding PBMS

- Postal Industry News & Information
- Enterprise News
- In The Press
- **Enterprise Wire**
- Around PB
- PBMS UK & ROI News



Today we announced that we have concluded our review of strategic alternatives for Pitney Bowes Management Services.  PBMS will continue to be focused on adding value as part of Pitney Bowes. This is a good outcome for PBMS, and for Pitney Bowes.

**Related Links**

- 27 June '08 – PBMS to Grow With Pitney Bowes

**Related Documents**

- Printable Version (.pdf)
- Press Release (.pdf)

This decision followed a detailed review of the strategic alternatives for PBMS.  Among the options we considered were selling the business, spinning the business off as a separate company, or keeping the business and managing it for growth and profitability.

I am pleased with the outcome for several reasons.  First, it is the best outcome for shareholders, and that was our primary goal.  PBMS has a highly-valuable presence in large enterprise accounts, in large law firms, and in government agencies, and is becoming an increasingly important channel for other Pitney Bowes products and services to these customers.  For these reasons, it makes sense for our shareholders to capitalize on this value.

I'm also pleased because this outcome is best for our customers.  They have come to rely on Pitney Bowes for a wide suite of products and services, and PBMS is a strong component of the total value that we can provide to them.

Finally, I am also pleased because we will retain our valuable employees who have made PBMS into the strong company it is today.  These employees are our co-workers and friends, and it is good news for all of us that they will remain with Pitney Bowes.

I would like to take a moment to thank all the employees of PBMS.  When we announced last year that we were exploring strategic alternatives for the business, we knew that this would cause uncertainty among these employees.  Yet they responded with true professionalism, and enabled PBMS not only to continue to do business to its usual high standards, but also to win several new customer accounts over the past months.  This is a remarkable achievement and was a sign of confidence that Management Services will continue to deliver on its promise for high value outsourced services.

This review process has helped crystallize three very clear

Court Doc

DA0004     74
Court Doc

new solutions such as Critical Communication Solutions, Document Management Services, and Document Processing Solutions, all of which have experienced great success with customers. Second, we need to bring greater technology to our traditional mailroom and print management services. Third, we must drive further integration of end-to-end solutions that incorporate more of the full suite of Pitney Bowes capabilities across all its businesses.

While I realize that the past eight months have been challenging for all of us, I look forward to continuing to work closely with Vince De Palma and the PBMS team. Together we will achieve our collective goals and build a strong future for all of Pitney Bowes.



Print this Page



E-mail this Page

PB.com / Security and Privacy / Terms and Conditions

© 2002 Pitney Bowes Inc. All rights reserved.

75
Court Doc

DA0005

75
Court Doc

# ⚏ Pitney Bowes

**Andrew R. Gold, Esq.**
Director
Labor and Employee Relations Counsel

World Headquarters
1 Elmcroft Road
Stamford, CT 06926-0700

203 351-6425
203 351-7545 Fax
andrew.gold@pb.com
www.pitneybowes.com

March 27, 2003

VIA FACSIMILE (202) 727-9589

Ms. Georgia Stewart
Government of the District of Columbia
Office of Human Rights
441 4th Street, N.W., Suite 570 North
Washington, D.C. 20001

RE: Daniel G. Atkins v. Pitney Bowes
    Docket No. 03-255-P(CN)

Dear Ms. Stewart:

I represent Pitney Bowes Management Services in the above referenced matter. Per my discussion today with your office, I will be on vacation on April 18, 2003 and unable to attend the scheduled mediation. I have provided alternative dates to your office. Please contact me with the rescheduled dates or with any questions.

Sincerely,

Andrew R. Gold

Cc: Betty Smith
    Zeke Dorsey

DA0006





DA0007

**This attached sheet contains my mailing, Postal, and (temporary) addresses.**


**Mailing Address:**

Daniel Atkins,   8-27th Avenue [Apt. 302] Bridgeview  Astoria, New York. NY 11102

**Temporary (very temporary) living quarters**

C/O: Daniel Atkins  163-45-130th Ave.  sec. C, 13D.  Jamaica, New York, NY  11434

**Post Office Box mailing;**

Daniel Atkins   JAF Station   PO Box 0582, New York, NY   10116-0582 **[Best place to mail correspondence]**

**Telephone Number:** 347-706-0408   [Best time is 'anytime'- **Except during class Wednesday evenings]**

**Email Address:** atkinsdaniel123@hotmail.com   **[Anytimre]**

